## CHILCOTT ET AL. v. HART, EXECUTOR, ET AL.

1. EQUITY—QUIETING TITLE.

In the absence of a permissive statute, a court of equity will not entertain a suit to quiet title by a plaintiff in possession against a defendant, unless the latter has unsuccessfully prosecuted several successive actions of ejectment.

2. SAME.

In order to give jurisdiction of an action to quiet title under the code, the plaintiff must be in possession.

3. WILLS.

The effect of a valid probate of a will, until such probate is duly set aside, or the will declared void in an appropriate proceeding, is, at least, to confer upon the executor constructive possession of all the real estate devised until the estate is settled, and then upon the trustee of the devisees (where one is appointed) during the execution of the trust.

4. PLEADING—INCONSISTENT AVERMENTS.

Plaintiffs cannot, in an action brought to quiet their title as the result of the obtaining of a decree declaring void the will of their ancestor, be heard to say that, as heirs, they are constructively in possession of the real estate devised in the will. Such an allegation is to be controlled by the other allegations showing that as a matter of law such possession is in one of the defendants under the will.

5. PRACTICE.

Generally, it is contrary to practice to decide questions not necessary to be determined, though presented in the record. Nevertheless, the rule is not inflexible, and it may be departed from when the ends of justice require it.

6. WILLS, CONSTRUCTION OF.

If several trusts are created by a will, which are independent of each other,—each complete in itself,—some of which are lawful and others unlawful, and which may be separated, the illegal parts,

though void for uncertainty, may be cut off, and the legal ones permitted to stand.

7. SAME.

The heir is not to be disinherited by conjecture, but only by express words or necessary implication. On the other hand, the will of the testator, if clearly expressed, must prevail. The tendency of the more recent adjudications is to give effect to testamentary dispositions which, under former technical decisions, would have been held void for uncertainty.

8. SAME—REMAINDERS.

An estate by way of testamentary disposition may be limited to take effect after the termination of a preceding estate for life or lives of persons in being and twenty-one years and nine months thereafter.

9. COMMON LAW, EVIDENCE OF.

With the exceptions specified in the statute, the common law of England, as found in the reports of cases decided since A. D. 1607, as well as of those decided before that year, constitutes the rule of decision in this state.

*Appeal from the District Court of Pueblo County.*

THE complaint in this action was filed in the district court of Pueblo county on March 30, 1894. In substance it alleges that the three plaintiffs are the children and sole heirs at law of the late Senator George M. Chilcott, who died on the 6th day of March, 1891; that at the time of his death Senator Chilcott was seized in fee simple and possessed of large and valuable tracts of real estate, described with particularity in the complaint; that the defendant Cornelius J. Hart, shortly after the death of said Chilcott, filed in the office of the county clerk of Pueblo county a certain paper writing purporting to be the last will and testament of said deceased, and that thereafter, and during the year 1891, said paper writing was admitted to probate by the said county court as and for the last will and testament of said deceased. By virtue of the said probate it is alleged that the said defendant Hart and other defendants, who are the minor children of plaintiffs, claim and assert an adverse interest against these plaintiffs in and to the real estate described in the complaint. The alleged will is then set forth at length, from which it appears that after the settlement of the estate and payment

of all debts and certain legacies named therein, the said real estate was devised to the said Hart, and his successor in office, in trust for the benefit of said minor children, the revenue thereof to be divided equally between testator's three children, to be held by said Hart until the death of the last of these plaintiffs, and then the title of the property to pass to the surviving grandchildren—one third thereof to each set of children.

It is further alleged that, notwithstanding the probate of said will under and by virtue of which the alleged adverse claims of the defendants are based and founded, it is utterly void and of no effect, upon the ground that it is in violation, of the rule against perpetuities, and because of certain irregularities and inconsistencies and irreconcilable repugnancies which are particularly pointed out; and that, as the sole heirs of said Senator Chilcott, these plaintiffs are seized in fee and entitled to the possession of all such real estate.

The prayer of the complaint is for a decree of the court adjudging the said alleged will to be void, and the probate thereof to be canceled and set aside, and that the plaintiffs be decreed to be the sole lawful heirs of the deceased George M. Chilcott, and as such be vested with the fee simple title in said real estate, and that the defendants be enjoined from claiming or asserting an adverse title to said real estate, and for general relief. Other allegations of the complaint, in so far as they are material, will be noticed in the opinion. To this complaint the defendants interposed a demurrer, which was sustained, on the ground that the same did not state facts sufficient to constitute a cause of action, and upon the ground of ambiguity and uncertainty (particularly specifying wherein the same consisted), and upon the ground that the court had not jurisdiction of the subject-matter of the action. The plaintiffs electing to stand by their complaint, the court dismissed the action; and from this judgment plaintiffs have appealed.

Mr. JOHN M. WALDRON and Mr. W. P. HILLHOUSE, for appellants.

Mr. CHAS. E. GAST and Mr. H. A. DUBBS, for appellees.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

The plaintiffs claim that this action is to quiet their title to real estate, and is maintainable under section 255 of the Code of Civil Procedure, of which the following is a copy:

" An action may be brought by any person in possession, by himself or his tenant, of real property, against any person who claims an estate therein adverse to him, for the purpose of determining such adverse claim, estate or interest."

The defendants, on the contrary, assert that, notwithstanding this claim of plaintiffs, the primary object of the action is to obtain a decree to annul and declare void the will of Senator Chilcott, which a court of equity is powerless to grant, even under the sweeping provisions of this law, and that the decree sought by plaintiffs to quiet their title would be only incidental to the main relief asked.

In form the complaint seems, in part, at least, to be one to quiet title, but whatever the plaintiffs may claim as to the character of the action, the necessary result of the decree, if in plaintiffs' favor, would be to declare the will void, and set aside the probate thereof, and as incidental thereto, or rather as a necessary result of the main object, to declare the title to be in plaintiffs.

This cause has been elaborately argued by counsel both orally and in printed briefs. The discussion has taken a wide range, but in the opinion may, for convenience, be grouped, as it was by counsel in argument, under four general heads, involving the following four propositions:

*First.* What is the effect of the valid probate of a will as to the validity of the devises of real estate contained in the will?

*Second.* Are the heirs at law, who have received the benefits of devises of real property, alleged to be void on the ground of public policy, estopped to dispute their validity?

*Third.* Is the present action maintainable under section 255 of the code of 1887?

*Fourth.* Are the devises of real estate contained in this will in violation of the rule against perpetuities, and are they so repugnant, contradictory and inconsistent as to render the will void for uncertainty?

In view of the conclusion which we have reached, the determination of the questions involved in the first and second propositions is neither necessary to our decision, nor of value to the parties, in so far as their rights under the will are concerned. For this reason we refrain from an expression of opinion upon them. Strictly, the decision upon the third question is not necessary, but, lest our silence might be interpreted as a recognition of the right asserted, we pass upon it also.

It is conceded, at the outset, that unless this action fairly comes within the purview of the code provision above quoted, it is not maintainable under the general jurisdiction of a court of equity; for in the absence of a permissive statute, a court of equity will not entertain a suit to quiet title at the instance of a plaintiff in possession against a defendant, unless the latter has unsuccessfully prosecuted several successive actions of ejectment. Pomeroy's Eq. Jurisp., vol. 1, sec. 246; vol. 3, sec. 1394.

But it is claimed that this statute is broad enough to include this action. It is significant that, although this or a similar provision is to be found in the reformed procedure of the various states since it was originally adopted in New York, no case has been cited by counsel, nor have our researches (which have been considerable) enabled us to find a precedent for the right, under this section, of an heir to have the will of his ancestor declared void and its probate canceled, and his title, clouded by such will, quieted. While this is not decisive of the question, it is, nevertheless, a persuasive reason for the nonexistence of the right. We do not think the legislature intended to give such a remedy, but that the effect of the statute is to enlarge the jurisdiction by

permitting the institution of a suit to quiet title by a plaintiff, even though he has not successfully defended against several successive actions in ejectment. Moreover, to give jurisdiction of any action fairly embraced within this section, the plaintiff must be in possession, actual or constructive. In some of the states the possession must be actual; in others, constructive possession satisfies the statute.

From the complaint it appears that Hart, under the power given him in the will, has been managing the estate as an entire property, and as to some of the real estate he holds the actual possession, and assumes to have constructive possession of the residue. The plaintiffs do not claim that they are in actual possession, but allege that they are seized of the property and in possession thereof as heirs at law, upon the ground that the will is void.

Under our statutes, a will devising real estate must be probated the same as a will bequeathing personalty, and the proceedings in the courts of this state are precisely the same in both cases. The record of the will, duly certified, and the probate thereof, are received as evidence of the title of real estate therein devised, the same as is the record of deeds to real estate. Gen. Stats. 1883, sec. 232; 1 Mills' Ann. Stats., sec. 467. The appellants concede that if the will is valid, the executor and trustee under this will would be clothed with the legal possession of all the property; but constructive possession cannot be in two antagonistic persons at the same time. To us it seems a reasonable construction to hold that the effect of a valid probate of a will devising real estate, until such probate is duly set aside, or the will declared void in an appropriate proceeding, is, at least, to confer upon the executor constructive possession of all of the real estate devised until the estate is settled; and then, as in this case, upon the trustee of the devisees until the trust is fully performed. Plaintiffs cannot, in the very action which they bring to quiet their title as the result of the obtaining of a decree declaring the will void, be heard to say that, as heirs, they are constructively in possession of the real estate devised

in the will. The allegation of their complaint, therefore, that they are in possession as heirs at law, must be considered as controlled by the other allegations of the complaint which, as a matter of law, we hold show that the possession which the plaintiffs must have in order to maintain this action is in one of the defendants as trustee.

For this reason alone the judgment must be affirmed; but by both parties are we urged to pass upon the main question in the case,—the validity or invalidity of the devises. While contrary to our practice to decide questions not necessary to be determined, though presented in the record, yet, in the present instance, the questions have been so thoroughly argued upon two different occasions, and as the decision upon this point must ultimately be made, we have concluded to decide this question in order to save costs to the litigants and to avoid useless consumption of time by the courts.

The validity of this will is attacked upon two general grounds: *First*, because of incurable uncertainties in several of its material provisions which are inseparably connected with the general plan of testamentary disposition; and, *second*, that it is in violation of the rule against perpetuities.

Pursuing this order in the discussion, it will materially shorten the opinion and more clearly bring out the respective contentions of the parties, as well as illustrate the general scheme of the testator, to set out *in hæc verba* the provisions attacked, and those which throw light upon the merits of the controversy.

In item 3, all the testator's personal property, if any, left after the payment of debts, is bequeathed to his three children, share and share alike.

In item 5, the real estate is devised to the executor and his successors in trust, upon these conditions: After providing out of the income of the real estate for the payment of taxes, insurance, repairs, and one or two small annuities, the will directs that:

" The residue of the income of my said real estate shall be divided equally among my said three children, share and

share alike, and to be distributed monthly; * * * and at the death of the last of my said three children, the title to the said real estate shall pass to and become vested in their heirs as follows:

" One-third to the surviving children of Harry Clay Chilcott, and their heirs forever; one-third to the surviving children of Melvin Scott Chilcott, and their heirs forever; one-third to the surviving children of Kate Price, and their heirs forever, *and in case either of my said children shall die, leaving no surviving husband, or wife or children, then his or her share of the income of the said real estate, shall be equally divided and distributed, one-half to each of the surviving children,* provided, nevertheless, that in case my said children should desire to avail themselves of the privilege of improving said real estate, and thereby increase the value of said property, and the revenue derived therefrom, they may, if they can amicably agree upon a division of said property, divide it into three equal parts, each one choosing one-third of said property, which part so chosen by him or her shall be the part or portion of said property which shall descend to and become vested in his or her children, at his or her death, as heretofore provided."

Then follows a provision that the executor shall collect the income, and from the whole amount collected shall deduct the amount of the annuities, taxes, etc., and shall pay over the balance to the three children, to each the amount collected from his or her portion of said real estate so divided. The concluding portion of this item is as follows:

" That in case of a division of said property, the income therefrom shall nevertheless in all respects be distributed and disposed of as heretofore first provided, *in jointure.*"

The 8th item is: " It is my will that none of the income derived from the said real estate shall be improperly used, and if in the judgment of my executor hereinafter named, such income is being improperly expended by either one of said children, then it is my will that after amply providing for the wants of such child, and his or her family, he with-

hold the residue, and reinvest the same in Pueblo real estate, or place it at interest, as he may deem best for *the parties interested.*"

The objections urged under this first ground of attack relate to the clauses of the will which we have above italicized.

This is an action to overthrow, not to construe, the will. Unless these items of the instrument claimed to be invalid are so uncertain as to admit of no rational interpretation, and, besides, so inseparably connected with the other parts of the will as that, if stricken therefrom, the general scheme of the testator will be defeated, the will, as a whole, should not be adjudged void. The general principle has been thus expressed: "If several trusts are created by a will which are independent of each other, and each complete in itself, some of which are lawful and others unlawful, and which may be separated from each other, the illegal parts, although void for uncertainty, may be cut off, and the legal ones permitted to stand." *Tilden v. Green*, 130 N. Y. 29.

In connection with this subject, there are two fundamental maxims well to bear in mind. One is that the heir at law shall not be disinherited by conjecture, but only by express words, or necessary implication. Schouler on Wills (2nd ed.), sec. 479. Another is that the will of the testator, if expressed in clear and unambiguous language, must prevail, even though it disinherits the heirs. The tendency of the more recent decisions is to give effect to testamentary dispositions which, under the former technical decisions, would have been held void for uncertainty. 1 Jarman on Wills (ed. 1861), p. 330, *et seq.* Judge Redfield, in his valuable work on Wills (vol. 2, p. 385), says:

"In very few cases are wills so defective and confused as to be incapable of being brought into harmony and intelligible meaning, by fair and allowable construction, within the ordinary range of judicial administration; and it is clearly the duty of courts to uphold every contract, and especially every instrument of a testamentary character, where the thing

can fairly be done; and it is little creditable to courts to evade just responsibility in such cases by shielding themselves behind some antiquated case, which might seem to justify a decision against its validity on the ground of uncertainty, when, at the same time, every member of the court is convinced, from the words of the will, what the testator must have intended, and that he could have meant nothing else. We should at the same time deprecate that latitudinarian mode of construction, whereby courts have attempted to bridge over every chasm in the language, however broad and impenetrable, by a lawless resort to conjecture, based upon no recognized canons of construction."

Bearing in mind these general principles, an examination of this will discloses that the primary object of the testator was that ultimately his grandchildren, living at the time of the death of the last one of his three children, should have the fee simple title of all his real estate; and, *second*, until the contingency should happen when the title finally vests, that his three children meanwhile should have the income therefrom. There is no uncertainty as to the meaning of the provision for the grandchildren, or of the main item relating to the application of the income to the children; but it is only as to certain methods for the distribution of the income upon the happening of some possible contingency that the uncertainty is said to attach.

The discretionary power in item 8 given to the trustee to withhold from any of the children of the testator who should improvidently spend his or her share such amount as the trustee should determine, and the power to invest the portion withheld "*for the benefit of the parties interested,*" and the provision in item 5 for an amicable division by the three children of the real estate, and the payment to each child of the income from his allotted share, coupled with the closing provision for distribution of the income *in jointure*, as first provided, notwithstanding such division into three equal parts be made of the income-bearing property, and the method provided in the same item, in case of the death of one of the

children—and not in the contingency of the death of two—for distributing the share of such deceased child in a certain specified way, are, each and all, subordinate or subsidiary to the two main provisions of the will hereinbefore referred to, and relate merely to the manner of the distributing of the income, in case of the happening of certain specified things. In no sense are they so connected with the main provisions and interdependent as that if one should fail, the others would likewise fail.

While we are not impressed with the uncertainty which appellants profess to discover in these subordinate provisions, it is sufficient to say that if the contingencies should happen, in which event only the meaning of these items would become practical questions, and there should then be any doubt in the mind of the trustee, or differences of opinion between the respective claimants of the income, as to who are " the parties interested" for whose benefit the income was invested, or as to the meaning, if any, of " *in jointure* " in the clause where it occurs, or what should be done with the income after the death of two of the children, in the circumstances stated, instead of the death of one only, as the provision is said to cover, a resort to a court exercising equitable jurisdiction for a construction of these items would be proper, and we apprehend there would not be much difficulty in harmonizing the different provisions, or carrying out the intention of the testator.

If, however, we should agree with appellants that each one of these items is incapable of enforcement, and therefore void for uncertainty, we are clearly of opinion that all of them might be stricken from the will without impairing its integrity as a whole, or without affecting the general scheme of the testamentary disposition, or interfering with or defeating the evident general intent of the testator. 2 Schouler, part 6, chap. 1.

The important question in the case is still to be determined. A mere reading of the will shows that the ultimate vesting of the fee of this estate is postponed until the termination

of the lives of three designated persons in being, viz., the three children of the testator, who were living at the time of his death. Upon the death of the last of the three, the fee vests, as provided in the will, in the then surviving grandchildren.

The contention of appellants is that this disposition of property is void in this state, in that it violates the rule against perpetuities, which, under the common law as in force in Colorado, prohibits the suspension of the fee for a longer period than that of one designated life in being.

There is no statutory provision touching this subject, and no decision of this court in point. The case is one of first impression in this state. It is conceded by appellants that in no state of the Union where the common law prevails, in the absence of a conflicting statute regulating the subject, would this will be held void on the ground indicated; and also that, under the common law of England of the present day, this will would be declared valid. By an elaborate historical argument, however, counsel seeks to except Colorado from the operation of the common law as generally understood in this country, and asks this court to apply to this will the rules of the common law as counsel says it was prior to the fourth year of James the First (1607).

The general outline of the argument is this : Independent of the statute the principles of the civil law would form the groundwork of jurisprudence in Colorado. The English common law has become incorporated in our general municipal law as the result of the following act of the general assembly :

" The common law of England, so far as the same is applicable and of a general nature, and all acts and statutes of the British parliament, made in aid of or to supply the defects of the common law prior to the fourth year of James the First [excepting certain designated statutes], and which are of a general nature, and not local to that kingdom, shall be the rule of decision, and shall be considered as of full

force until repealed by legislative authority." General Statutes (1883), sec. 197; Mills' Ann. Stats., sec. 4184.

The construction of this statute by appellants is that the common law as it existed and was defined in the courts of England prior to the fourth year of James the First, only, was incorporated, and that subsequent decisions of the English courts, as well as acts of the British parliament, have no force in this state.

By the principles both of the civil and the common law prior to the reign of James the First, and, for that matter, nearly a century thereafter, the common law, as expounded by the courts, would have declared invalid such a testamentary disposition as this will makes, for it postpones the vesting of a fee for a longer period than one designated life in being. Any modification or enlargement of the common law, however, by judicial construction, or by acts of the British parliament, is inoperative in Colorado as contrary to the spirit and letter of our statute, above cited; and it is only by the development of the rule against perpetuities made by decision of the house of lords in 1685 in the *Duke of Norfolk's Case*, and from time to time followed by the English courts from that time to the present, that it was permitted to suspend the vesting of the fee for the period of one or more lives in being and twenty-one years and a fraction thereafter.

It is said that the policy of our laws, and the principles of our public policy unite in forbidding recognition to the extension of the rule prevailing during the reign of James the First; and therefore, as a question of judicial policy untrammeled by considerations of *stare decisis*, we are asked to enunciate a rule for this state restricting executory devises, or any testamentary disposition, of real estate suspending the fee or fettering alienation to a period not exceeding that of one enumerated life in being.

The appellees question the soundness of the appellants' deduction of this rule from the authorities cited, and deny the historical accuracy of the argument. However, they in-

sist that the rule always was confined to executory devises proper, and to some classes of contingent remainders, in certain circumstances, and never applied to a vested remainder, such as is the estate devised to the grandchildren in this will. But if the character of the estate in question comes within the rule against perpetuities, as being a contingent remainder or an executory devise proper, they insist that the devise, nevertheless, is valid within the rule of the common law in force at the present day in this state, and that the construction put by appellants upon our statute adopting the common law is forced and unnatural, contrary to the general understanding of the profession, and opposed to the decisions of other states enforcing the common law under the authority of similar statutes.

It is not always easy to determine whether a limitation is a vested, or a contingent, remainder. In cases of doubt, courts lean towards holding it as vested, rather than contingent, if consistent with sound construction. 2 Fearne on Remainders, chap. 2, p. 200. Here a particular freehold estate in trust is granted to Hart and his successors, with the remainder over to such of the grandchildren of Senator Chilcott as are living at the time of the death of the last of the testator's three children. This limitation is not an executory devise, nor is it a vested remainder; for the persons in whom the fee will ultimately vest are, in the nature of things, dubious and unascertainable so long as any one of the three children is alive. It follows that until the death of the last child, the grandchildren who will take are uncertain, and, hence, the remainder is a contingent remainder—contingent in respect to the persons who will take. The same reason, therefore, exists for the application to it of the rule against perpetuities as to an executory devise proper, which, however, does not apply to a vested remainder. Gray's Rule Against Perpetuities, sec. 205. See *McArthur v. Scott*, 113 U. S. 340, on this and other points in the case. 2 Fearne on Remainders, 185; 2 Blackstone's Com. (3d ed., Cooley),

chap. 11; 2 Washburn on Real Property (4th ed.), book 2, chap. 4; 20 Am. & Eng. Ency. of Law, p. 858, *et seq.*

Our examination of the authorities cited (all of which are collated in Gray on Perpetuities) leads to the conclusion that the reasons upon which were based the earliest English decisions declaring certain testamentary dispositions of property void as against public policy were that the estates so devised were inalienable or indestructible.

The rule had its origin in connection with executory devises of chattels real and not of freehold estates, but no suggestion that the invalidity of a future limitation of real estate is dependent upon its remoteness appears until much later than the case of *Smith v. Warren*, Cro. Eliz. 688, decided in 1599. Gray on Perpetuities, sec. 147. Its application to limitations of real property was extended and became practically necessary when such limitations were held to be inalienable in order to restrain the indefinite tying up of estates.

Up to *Manning's Case* (1609), 8 Co. 94 b, an executory devise after a life term, like one after an indefinite failure of issue, was supposed to be bad as a limitation; but *Manning's Case* made them both good; and in *Bennet v. Lewknor* (1616), 1 Roll. Reps. 356, is there found the first notion of remoteness as an objection to limitation.

In *Child v. Baylie* (1623), Cro. Jac. 459; 2 Roll. 129, one of the judges announced the principle that the validity of an estate on condition precedent depended not on the character, but on the time of the contingent event. But this rule was discountenanced by the other judges, and was not even formulated as a rule till a later date, and never became firmly established on this principle, says Prof. Gray, until the great case of the *Duke of Norfolk* was decided in the house of lords in 1685. 3 Ch. Cas. 1, 34.

Counsel for appellants rely upon the case of *Pells v. Brown* (1620), Cro. Jac. 590; 2 Roll. 196, 216, as establishing the doctrine for which they contend. This case has been referred to by some of the judges and the text writers as the founda-

tion of this branch of the law, and undoubtedly had great influence in moulding it, but we think that Prof. Gray has demonstrated, what a reading of the case itself shows, that it is not entitled to that distinction, although it had great influence upon the doctrine in question, for it is apparent from a reading of the case that the court uses the term "perpetuity" in its original sense of indestructible or inalienable, and not in the sense of remoteness of time.   Even in this case, as reported in 1 Equity Cases Abridged, p. 187, it is said that the devise in question is good, as the contingency would happen within the compass of *lives then in being*.   It is proper, however, to say that this case is badly reported, and is not stated the same way by the various reporters.

This brief discussion is pertinent in this connection, for, to maintain their position, counsel for appellants must show from the English decisions that prior to 1607 the law, as then understood, would have rendered the devise now before us void because the vesting of the fee is too remote in time. But the result of the authorities, as we have just stated, is that prior to 1607 the only reason given by the judges for declaring void the devises of a conditional estate was on account of their character as inalienable or indestructible, and not that the vesting of the fee was too long postponed. It was not until about 1620,—13 years after the period to which, counsel for appellants claim, we are limited in the enforcement of the common law,—that we meet with the suggestion of remoteness as an objection.

From the very first suggestion with which we meet down to the time of the *Duke of Norfolk's Case* in 1685, there was a gradual development and unfolding of the doctrine, the first definite enunciation of which was that the postponing of the vesting of a fee for the period of one designated life in being was good; and finally in the leading case of the *Duke of Norfolk* this period was said to be for a life, or lives, in being, when the doctrine was thus expressed: "A future interest might be limited to commence on any contingency which must occur within lives in being." Gray on Perpetuities, sec. 170.

Thereafter the rule was gradually extended so as to cover the time necessary for the birth of posthumous children, and the minority of a person who was under age at the termination of the life or lives in being, until finally in England, as well as in all of the states of the Union which have adopted the common law and where the matter is not regulated by statute, it may be said that a future estate by way of testamentary disposition may now be made to commence after the termination of a preceding estate granted for the life or lives of persons in being and twenty-one years and nine months thereafter.

If the estate devised in Senator Chilcott's will is void, it is not because of the fact that we have adopted the common law as understood in England prior to 1607, and not afterwards, and that such common law prohibited the suspension of the vesting of the fee for a period longer than the life of one designated life in being, for we do not find that such a rule was then in force. The rule against perpetuities was of slow growth and in its development it was for no considerable period, if at all, that the time was thus limited to one life only. The common law thus being a constant growth, gradually expanding and adapting itself to the changing conditions of life and business from time to time, what the law is at any particular time must be determined from the latest decisions of the courts; and the recognized theory is that, aside from the influence of statutory enactments, the latest judicial announcement of the courts is merely declaratory of what the law is and always has been. We are at liberty, therefore, if not absolutely bound thereby, to avail ourselves of the latest expression of the English courts upon any particular branch of the law, in so far as the same is applicable to our institutions, of a general nature, and suitable to the genius of our people, as well as to consult the English decisions made prior to 1607.

But the general rule against perpetuities, as we have stated it, as existing in this country in the absence of special statutory enactment, was well known when our legislature

enacted the statute upon the subject of the common law. Our statute is practically a literal transcript of the Illinois statute of 1845 (Revised Statutes of Illinois, 1845, 337), and of the Illinois statute of 1874 (Revised Statutes of Illinois, 1874, 269; Starr & Curtis's Ann. Stats., 563); and, with the exception of the words "so far as the same is applicable and of a general nature," is substantially the same as the Illinois act of 1819 (2 Scammon, 579). The original of these acts seems to have been in Virginia, and prior to the enactment in Illinois was adopted in Indiana in 1807. Our act was passed originally in 1861, and reënacted, with slight changes, in 1868, which reënactment is in force at the present time.

*Rhoads v. Rhoads*, 43 Ill. 239, and *Waldo v. Cummings*, 45 Ill. 421 (decided in 1867), were cases calling for an announcement of the rule against perpetuities, and the court, in effect, held that under this statute the English common law as found in the reports since 1607, as well as before, constituted the rule of decision in Illinois, so far as it is general and applicable to the condition of things there existing; and it was accordingly held that the law in that state where there was no statute concerning perpetuities, permitted a testator to make a devise of real estate to commence upon a contingency happening within the period of a life or lives in being and twenty-one years and a fraction thereafter.

While not expressly so deciding, yet the logical effect of these decisions is that the decisions of the English courts, announced since 1607, are controlling in Illinois, so far as applicable and of a general nature, and where not changed by statute; because, as appellants here claim, the rule against perpetuities, as enforced by the supreme court of Illinois, was established by the English courts long after the reign of James the First. If the Illinois court had construed the statute as making the English common law, as existing prior to 1607, and not afterwards, the rule of decision in that state, it probably would have announced a different rule against perpetuities. The same construction of this statute was

recognized in the earlier cases of *Boyer v. Sweet*, 3 Scam. 120; *Penny v. Little*, 3 Scam. 301; *Gerber v. Grabel*, 16 Ill. 217; and, by implication, in *Guest v. Reynolds*, 68 Ill. 478.

It must be presumed that our legislature was familiar with these decisions, and under a familiar rule of construction, unless there are peculiar reasons for a contrary holding, when a state adopts the statute of another state, the construction which the courts of the latter state put upon the statute before such adoption should be followed by the courts of the adopting state.

It is not urged with any force (nor do we know of any substantial basis for such contention) that the conditions existing in this state are so different from those in Illinois, or that the modern rule against perpetuities existing in England and in America is so incompatible with our institutions, as that these considerations would authorize us to adopt a rule different from that in force in such jurisdictions. If our legislature in 1868 had deemed it to be a matter of sufficient importance to modify the rule against perpetuities as generally understood in this country, or had considered the rule as contrary to sound public policy, or incompatible with the conditions here existing, it is reasonable to suppose that, in adopting the common law, it would have, by apt words, qualified the same, and that that, or some subsequent, general assembly would have, by some positive enactment, limited the scope of the rule as generally understood.

The reasons, whatever of force they possess, urged upon us by counsel, to adopt a rule which at one designated period of time was in existence in England during the gradual unfolding of the doctrine, might be properly addressed to the legislature, but are not of such persuasiveness as to lead us to change what may be termed a rule of property.

Our attention has been called to a decision by Mr. Commissioner Stallcup, in *Herr v. Johnson*, 11 Colo. 393, wherein he states (what was not necessary to a decision in that case) that our legislature adopted the common law as it existed prior to the fourth year of the reign of James I., and our

courts cannot substitute a different date. The point under consideration in that case was whether a landlord could distrain for rent in the absence of such right reserved in the lease. Such right did not exist at common law prior or subsequent to 1607, but, as the authorities cited in that case show, was conferred by an act of parliament passed after that time and during the reign of George II. So that, while it is clear that in this state acts of the British parliament passed since 1607 are not in force—which was the only point in the case of *Herr, supra,*—it does not follow that the common law of England, unaffected by subsequent acts of parliament, and as expounded by the English courts since that time, may not be the rule of decision in this state, provided the same is applicable and of a general nature, and the remark by the learned commissioner was *dictum.*

Since this court was first constituted it has been enforcing the common law of England, so far as applicable and of a general nature, and, in ascertaining what the common law is has repeatedly consulted, and referred with approval to, the decisions of the English court rendered since, as well as prior to, the year 1607, without inquiring whether the doctrine of the cases subsequent to that date differed from the common law as found in the decisions prior thereto. This is true, also, of the courts of Indiana, Illinois, and other states of the Union.

In view of this uniform practice of this and other courts, and in view of the construction by the Illinois courts of this act adopting the common law, which we borrowed from that state, we think that what is known as the modern rule against perpetuities, viz., that a future estate may be limited to take effect after the termination of one or more lives in being and twenty-one years and a fraction thereafter, is in force in this state.

The judgment of the district court is affirmed.

*Affirmed.*