DEAN V. MORNINGSTAR, *et al.*,

*v.*

THE BLACK AND DECKER MANUFACTURING COMPANY

(No. CC905)

Decided April 13, 1979.

---

858

*Preiser & Wilson, Stanley E. Preiser, Donald R. Wilson; Monty L. Preiser, R. Joseph Zak, Ted M. Kanner* for plaintiffs.

*Jackson, Kelly, Holt & O'Farrell, W. T. Shaffer, James A. Yates* for defendant.

*James M. Sprouse, G. Charles Hughes* amicus curiae for WV Trial Lawyers Ass'n.

Miller, Justice:

This case presents the question of the extent to which a manufacturer of a defective product is liable in tort in this State to a person injured by such product.

The question comes to us from the United States District Court for the Southern District of West Virginia under the Uniform Certification of Questions of Law Act.[1] The plaintiffs, the Morningstars, filed a personal injury action in the District court based on diversity of citizenship against the defendant, Black and Decker Manufacturing Company. The basis for their action is the allegation that Black and Decker manufactured an "8-Inch Builders Sawcat" and Mr. Morningstar was injured when the saw's safety guard failed to close. Mrs. Morningstar sued for loss of consortium.

The Morningstars' complaint set out multiple theories for the defendant's liability, all based on tort concepts. We will discuss these various theories in some detail in the latter portion of this opinion. For our present purposes, they may be identified as the rule of the *Restatement, Second, Torts* § 402A (1965), the principles set out in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963), and the rule of the *Restatement, Second, Torts* § 519 (1977), commonly known as the *Rylands v. Fletcher*[2] Doctrine.

The Federal District Court, perceiving there was some lack of clarity in the decisions of this Court on this

---

[1] W.Va. Code, 51-1A-1, *et seq.*, and particularly Section 1, which provides:

"The supreme court of appeals of West Virginia may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state, when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of this State."

[2] L.R. 3 H.L. 330 (1868), *aff'g* L.R. 1 Ex. 265 (1866).

subject, and recognizing under *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487 (1938), that it was required to apply the substantive tort law of this State to the Morningstars' case, sought this certification.

Black and Decker initially raises two procedural issues of which we must dispose before addressing the substantive law. It contends that upon such a certification, we are bound to determine the manufacturer's liability based on our past law and not on what we may conceive it to be at the present. Second, we are reminded that as a result of W.Va. Code, 2-1-1, and the provision found in Article VIII, Section 13 of the West Virginia Constitution, we are not empowered to alter the common law as it existed in 1863.

# I
## THE CERTIFICATION QUESTION

This case presents the first occasion for this Court to accept a certification under W.Va. Code, 51-1A-1, *et seq.* We begin by noting that the provisions of this statute are not mandatory. Section 1 provides: "The supreme court of appeals of West Virginia may answer questions of law certified to it. . . ." In the Commissioners' Comment to Section 1 of the Uniform Certification of Questions of Law Act, the following statement is made:

> "This section provides that the highest court of the state has the right to answer questions certified to it; it is not mandatory. Under some circumstances it is possible that the court might decide not to answer a certified question. . . ." [Uniform Certification of Questions of Law Act (U.L.A.) § 1, Comment, at 52]

*Cf., In re Richards*, 223 A.2d 827 (Me. 1966).

The growth of the Uniform Certification of Questions of Law Act has largely been a response to the Abstention Doctrine, which was a necessary outgrowth of *Erie Railroad v. Tompkins, supra.*[3] In *Erie,* the Court held

---

[3] *See, e.g., Kaiser Steel Corp. v. W. S. Ranch Co.,* 391 U.S. 593, 20 L. Ed. 2d 835, 88 S.Ct. 1753 (1968); *Louisiana Power & Light Co. v.*

that in diversity cases federal courts were no longer "free to exercise an independent judgment as to what the common law of the State is—or should be; ... " but must apply the substantive law as evolved by the state either through its statutes or its court decisions. 304 U.S. at 71, 58 S.Ct. at 819, 82 L. Ed. at 1190, 114 A.L.R. at 1489. *Erie* in effect overruled *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L. Ed. 865 (1842), which held that in diversity cases the federal courts could declare the substantive law independently of that evolved by the state courts except in purely local matters.

It is rather apparent that where our State's substantive law is clear, there is no need to obtain certification under W.Va. Code, 51-1A-1, *et seq.* The language of this provision makes this manifest, since the certification is limited to those questions "which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of this State." W.Va. Code, 51-1A-1.

For a considerable period of time, we have had an internal statutory certification procedure whereby the circuit courts may obtain from this Court a definitive statement of the law. W.Va. Code, 58-5-2. Historically, we have treated this procedure as a means of clarifying the current state of our law, so that the trial courts may proceed to try a case on the correct legal principles.[4]

---

*City of Thibodaux*, 360 U.S. 25, 3 L. Ed. 2d 1058, 79 S.Ct. 1070 (1959); Kurland, *Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine*, 24 F.R.D. 481, 489-90 (1959).

[4] *See, e.g., Teller v. McCoy,* ___ W. Va. ___, 253 S.E.2d 114 (1978) (whether residential lease contains implied warranty of habitability); *Harless v. First National Bank,* ___ W. Va. ___, 246 S.E.2d 270 (1978) (whether private employee can be discharged for lawful criticism of employer); *Neal v. Huntington Publishing Co.,* ___ W. Va. ___, 223 S.E.2d 792 (1976) (whether libel of public official may be proved by extrinsic evidence of his identity); *Dawson v. Canteen Corp.,* ___ W. Va. ___, 212 S.E.2d 82 (1975) (whether suit by buyer of cheeseburger from vending machine is barred by lack of "privity" from suing baker of cheeseburger bun).

In states having external certification statutes similar to W.Va. Code, 51-1A-1, courts have generally recognized that the certification is designed to resolve ambiguities or unanswered questions about the receiving state's law. *See, e.g., Wansor v. George Hantscho Co.,* 570 F.2d 1202 (5th Cir. 1978); *Almarez v. Carpenter,* 173 Colo. 284, 477 P.2d 792 (1970); *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 1976); *Pierce v. Secretary of H.E.W.,* 254 A.2d 46 (Me. 1969); *Norton v. Benjamin,* 220 A.2d 248 (Me. 1966); *Irion v. Glens Falls Insurance Co.,* 154 Mont. 156, 461 P.2d 199 (1969); *Ford v. Black Mountain Tramways,* 110 N.H. 20, 259 A.2d 129 (1969); *In re Elliott,* 74 Wash. 2d 600, 446 P.2d 347 (1968).

We conclude, therefore, that from the language of W. Va. Code, 51-1A-1, together with the conventional construction placed by other courts on similar certification statutes, this Court, in answering a certified question, must of necessity determine the present law bearing on the issue certified.

## II
## THE EFFECT OF ARTICLE VIII, SECTION 13, AND CODE 2-1-1 ON THIS COURT'S ABILITY TO MODIFY THE COMMON LAW

Black and Decker urges that Article VIII, Section 13 of our Constitution and W.Va. Code, 2-1-1,[5] operate as a bar to this Court's ability to change the common law. These two provisions have led to some confusion in the

---

[5] Article VIII, Section 13 reads:
"Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature."

W.Va. Code, 2-1-1, states:
"The common law of England, so far as it is not repugnant to the principles of the Constitution of this State, shall continue in force within the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundered and sixty-three, or has been, or shall be, altered by the legislature of this State."

opinions of this Court and have brought into existence two conflicting responses.

The first is a line of cases which suggest that this Court cannot alter the common law and that such alterations must come from the Legislature. *See, e.g., Seagraves v. Legg*, 147 W. Va. 331, 127 S.E.2d 605 (1962) (absence of wife's right to sue for loss of consortium resulting from personal injury to husband); *Walker v. Robertson*, 141 W. Va. 563, 91 S.E.2d 468 (1956) (bar to women serving on petit jury); *State v. Arbogast*, 133 W. Va. 672, 57 S.E.2d 715 (1950) (rule that dogs cannot be subject of larceny); *Shifflette v. Lilly*, 130 W. Va. 297, 43 S.E.2d 289 (1947) (strict liability of innkeeper to guest for personal injury or property damage); *Poling v. Poling*, 116 W. Va. 187, 179 S.E. 604 (1935) (interspousal tort immunity), *overruled, Coffindaffer v. Coffindaffer*, ___ W. Va. ___, 244 S.E.2d 338 (1978); *Cunningham v. Dorsey*, 3 W. Va. 293 (1869) (applying English common law rule that easement of "ancient lights" can arise only by adverse enjoyment from time immemorial.)

A subcategory within this category consists of those cases where the Court has acknowledged that it is required to apply the common law as it existed in 1863, but has been able to find a common law precedent that enables the Court to follow more modern common law principles. *See, e.g., Long v. City of Weirton*, ___ W. Va. ___, 214 S.E.2d 832 (1975) (abolishing doctrine of municipal tort immunity).

A second and rather divergent approach has been taken in cases where the Court has said a common law rule may be overruled or modified where the old rule does not meet existing conditions. In many of these cases the Court mentions neither the statutory nor the constitutional provision. *See, e.g., Currence v. Ralphsnyder*, 108 W. Va. 194, 151 S.E. 700 (1929) (restricting doctrine of champerty); *Powell v. Sims*, 5 W.Va. 1, 13 Am. Rep. 629 (1871) (disapproving doctrine of ancient lights); *see also Board of Education v. W. Harley Miller, Inc.*, ___ W. Va. ___, 221 S.E.2d 882, 888 (1975) (Neely, J., concurring)

(disapproving doctrine that arbitration agreement is no bar to suit on underlying contract); *State ex. rel. Worley v. Lavender*, 147 W. Va. 803, 131 S.E.2d 752, 761 (1963) (Calhoun, J., dissenting) (disapproving rule that husband and wife may not testify to "nonaccess" in bastardy proceeding).

Included within this category are cases in which the Court has adopted new common law principles without ever discussing whether those princples arose out of pre-1863 common law. *See, e.g., Teller v. McCoy*, ___ W. Va. ___, 253 S.E.2d 114 (1978) (affording residential tenant implied warranty of habitability); *Harless v. First National Bank*, ___ W. Va. ___, 246 S.E.2d 270 (1978) (limiting private employer's right to discharge an at-will employee); *Lee v. Comer*, ___ W. Va. ___, 224 S.E.2d 721 (1976) (establishing right of unemancipated minor to maintain action against parents for personal injuries received in automobile accident); *State v. Grimm*, 156 W. Va. 615, 195 S.E.2d 637 (1973) (abolishing the M'Naghten common law rule on insanity and adopting a rule similar to the Model Penal Code); *Adkins v. St. Francis Hospital*, 149 W. Va. 705, 143 S.E.2d 154 (1965) (abolishing doctrine of charitable immunity in tort cases against hospitals); *Weaver Mercantile Co. v. Thurmond*, 68 W. Va. 530, 70 S.E. 126, 33 L.R.A. (N.S.) 1061 (1911) (adopting *Rylands v. Fletcher* Doctrine, which did not come into the English common law until 1868); *Snyder v. Wheeling Electrical Co.*, 43 W.Va. 661, 28 S.E. 733, 64 Am. St. Rep. 922, 39 L.R.A. 499 (1897) (adopting *Res Ipsa Loquitur* Doctrine, which *Byrne v. Boadle*, 2 H. & C. 722, 159 Eng. Rep. 299 (1863), created on November 25, 1863, some five months after our Constitution was adopted on June 20, 1863).

While there has been a lack of consistency on the part of this Court in its treatment of W.Va. Code, 2-1-1, and Article VIII, Section 13 of our Constitution there apparently has been no attempt made to determine the origin of and the historical reasons for these two provisions. In fact, in *Seagraves v. Legg*, 147 W. Va. 331, 336, 127 S.E.2d 605, 607 (1962), we find this statement in reference to

these two provisions: "Apparently [other] states do not have the same constitutional and statutory provisions as West Virginia. . . ."

Our constitutional and statutory provisions are not unique, but are similar to many state constitutional provisions statutes and early colonial and territorial charters.[6] It can be shown from the decisions of other courts that these provisions were designed to establish the initial body of law on which the particular state would operate, and were not viewed as provisions designed to limit the courts in their historic role of developing the common law.

At an early date in *Baring v. Reeder*, 11 Va. (1 Hen. & M.) 154, 161-63 (1806), the Supreme Court of Virginia met this issue under a 1776 ordinance which provided that the common law of England and acts of Parliament prior to the fourth year of King James the First "shall be the rule of decision, and shall be considered as in full force, until the same shall be altered by the legislative power of this colony."[7] The court stated the effect of this ordinance on the common law as interpreted by the Virginia courts:

"I would receive them [modern English decisions] merely as affording evidence of the opin-

---

[6] Original constitutions, statutes and charters of various states may be found in F. Thorpe, *American Charters, Constitutions and Organic Laws 1492-1908* (7 vols. 1909) (cited herein as Thorpe).

[7] The applicable text of the ordinance of 1776 is:

"[T]hat the common law of England, all statutes or acts of parliament made in aid of the common law prior to the fourth year of the reign of King James the first, and which are of a general nature, not local to that kingdom, together with the several acts of the general assembly of this colony now in force, so far as the same may consist with the several ordinances, declarations, and resolutions of the general convention, shall be the rule of decision, and shall be considered as in full force, until the same shall be altered by the legislative power of this colony." [9 Hening's Virginia Statutes, Ch. V at 127]

The Jamestown settlement of 1607 (the fourth year of the reign of King James the First) was legally authorized by a royal charter granted by James I in 1606. J. Story, *Commentaries on the Constitution of the United States* (1891), § 41 at 20.

ions of eminent Judges as to the doctrines in question, who have at least as great opportunities to form correct opinions as we have, and are influenced by no motives but such as are common to ourselves: and with respect to ancient decisions in England, what Judge would wish to go further? Who will contend that they are binding authorities upon us, in all cases whatsoever? Shall we not have the privilege every day exercised in England, of detecting the errors of former times? Shall we 'take our law of evidence from Keeble and Siderfin?' Shall we go back to the Gothic days of Lord Coke, and reject every man as a witness who is not a Christian? If we are to draw a line of exclusion on a subject no way affected by the change of our government, (I speak now in relation to the law of meum et tuum,) why shall we not rather keep our eye upon the particular topics in question, and vary our rule accordingly, than upon the time of our separation, which has no necessary connection at all with the subject? It would be infinitely more mischievous for us to receive en masse all the doctrines of the common law as our law, and the ante-revolutionary reports thereto relating, than to select what is really our law, and even to read the modern decisions upon the subject thereof. . . ." [11 Va. (1 Hen. & M.) at 162-63]

In *Trustees, etc., of Town of Brookhaven v. Smith*, 188 N.Y. 74, 77-80, 80 N.E. 665, 666-67, 9 L.R.A. (N.S.) 326, 327-28 (1907), the court had before it a constitutional provision referring to the common law of 1777—the year in which New York adopted its first constitution.[8] It declined to treat this provision as preventing the judicial alteration of the common law:

"The adoption by the people of this state of such parts of the common law, as were in force on the 20th day of April, 1777, does not compel us to incorporate into our system of jurisprudence principles, which are inapplicable to our circumstances and which are inconsistent with our no-

---

[8] *See* Thorpe, *supra* n. 6, Vol. 5 at 2635-2636.

tions of what a just consideration of those circumstances demands." [188 N.Y. at 79, 80 N.E. at 667, 9 L.R.A. (N.S.) at 327-28]

The Nebraska court in *Williams v. Miles*, 68 Neb. 463, 469-71, 94 N.W. 705, 708, 110 Am. St. Rep. 431, 437-38, 62 L.R.A. 383, 386 (1903), was asked to hold that its statute adopting the common law of England required the court to be bound by English precedent prior to the American Revolution:

> "We can not think, and we do not believe this court has ever understood, that the legislature intended to petrify the common law, as embodied in judicial decisions at any one time, and set it up in such inflexible form as a rule of decision. The theory of our system is that the law consists, not in the actual rules enforced by decisions of the courts at any one time, but the principles from which those rules flow; that old principles are applied to new cases, and the rules resulting from such application are modified from time to time as changed conditions and new states of fact require. . . ." [68 Neb. at 470, 94 N.W. at 708, 110 Am. St. at 437, 62 L.R.A. at 386]

The Colorado court in *Chilcott v. Hart*, 23 Colo. 40, 51-59, 45 P. 391, 395-98, 35 L.R.A. 41, 47-50 (1896), was asked to construe its statute, which was similar to the 1776 Virginia ordinance,[9] to require the enforcement of the English common law prior to 1607 in connection with an antiquated interpretation of the Rule against Perpetuities. In rejecting this proposition, the court stated:

> "We are at liberty, therefore, if not absolutely bound thereby, to avail ourselves of the latest expression of the English courts upon any particular branch of the law, in so far as the same is applicable to our institutions, of a general nature, and suitable to the genius of our people, as well as to consult the English decisions made prior to 1607." [23 Colo. at 56, 45 P. at 397, 35 L.R.A. at 49]

---

[9] *See* note 7 *supra*, at 9.

Both Ohio and Pennsylvania also refused to interpret counterpart provisions as restricting the court's right to modify the common law. In *Bloom v. Richards*, 2 Ohio St. 387, 390 (1853), the following statement was made:

> "The English common law, so far as it is reasonable in itself, suitable to the condition and business of our people, and consistent with the letter and spirit of our Federal and State constitutions and statutes, has been and is followed by our courts, and may be said to constitute a part of the common law of Ohio, But wherever it has been found wanting, in either of these requisites, our courts have not hesitated to modify it to suit our circumstances, or, if necessary, to wholly depart from it. . . ."

In *Carson v. Blazer*, 8 Pa. (2 Binn.) 475, 484, 4 Am. Dec. 463, 467 (1810), this issue was laid to rest in the following terms:

> "And the law of the 28th January 1777, provides that the common law of England shall be in force and binding on the inhabitants of this state. 1 *Dall. St. Laws* 723. But the uniform idea has ever been, that only such parts of the common law as were applicable to our local situation have been received in this government. The principle is self-evident. The adoption of a different rule would, in the language of Sir Dudley Ryder, resemble the unskilful physician, who prescribes the same remedy to every species of disease."

While the problem is of ancient origin, it is not without more modern precedent. As in the present case, the issue arises in those cases where the court is asked to make some departure from the English common law.

The same argument advanced here was rejected in *Latz v. Latz*, 10 Md. App. 720, 731, 272 A.2d 435, 441 (1971), where the court stated:

> " '[W]hether parts of the common law are applicable because of our circumstances and situations and on a general code of laws and jurisprudence, is a question which comes within the province of

the courts of justice and is to be decided by them.' Gilbert v. Findlay College, 195 Md. 508, 513, 74 A.2d 36, 38. Art. 5 referring to the common law en masse existing here either potentially or practically, as it prevailed in England on 4 July 1776, State v. Buchanan, 5 Har. & J. 317, 358, does not preclude a change of it by judicial decision. We hold that Art. 5 of the Declaration of Rights of Marland does not preclude the *Schneider [Schneider v. Schneider*, 160 Md. 18, 152 A. 498 (1930)] rule."

Justice Schaefer of the Illinois Supreme Court dispatched this same issue in *Amann v. Faidy*, 415 Ill, 422, 114 N.E.2d 412 (1953). There, an Illinois statute had set the common law as of the fourth year of James I, and stated that it "shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority":

"What the statute adopted was not just those precedents which happened to have already been announced by English courts at the close of the sixteenth century, but rather a system of law whose outstanding characteristic is its adaptability and capacity for growth. The common law which the statute adopted 'is a system of elementary rules and of general judicial declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions and the exigencies and usages of the country.' Kreitz v. Behrensmeyer, 149 Ill. 496, 36 N.E. 983, 984, 24 L.R.A. 59."[10] [415 Ill. at 433-34, 114 N.E.2d at 418]

---

[10] Justice Schaefer also observed that if the statute had forged the common law for the Illinois court as of 1607, then many fields of the law would never have been developed:

"The complaint in this case would certainly fail to state a cause of action because negligence did not emerge as a separate basis of tort liability until two hundred years after 1607. (Prosser on Torts, sec. 28) The development of the law of contracts would lie before us, for Slade's case (76 Eng. Repr. 1074) was not decided until 1602. The law of *quasi*-contracts began with Moses v. Macferlan, 97 Eng. Repr. 676, decided in 1760. The validity of a future interest in real

The Kentucky court in *City of Louisville v. Chapman*, 413 S.W.2d 74 (Ky. 1967), under a constitutional section similar to ours,[11] rejected the notion that this provision froze the courts' ability to alter the common law:

> "The writers of the Constitution in dealing with governmental immunity (a product of the common law) stated in section 233 that the common law 'shall be in force within this State until they shall be altered or repealed by the General Assembly.' But the common law is not now, nor was it ever, a static body of the law. It (the common law) may be likened to a mighty rising river. It may and it must spill over into new fields and new territory in order to make its way to the sea....
>
> . . . .
>
> "We do not think the framers of our Constitution intended to shackle the hands of the judicial branch of government in its interpretation, modification or abolition of the great body of mutable common law to meet the demands of changing times." [413 S.W.2d at 77]

Wisconsin has discussed this subject in several cases in connection with its constitutional provision, which states:

> "Such parts of the common law as are now in force in the territory of Wisconsin, not inconsis-

---

property was first made to depend upon the period within which it would vest in the Duke of Norfolk's case, 22 Eng. Repr. 931, decided in 1682, and the present period of the rule against perpetuities became settled in Codell v. Palmer, 1 Clark & F. 372, decided in 1833. We would have no law of agency, for it, too, developed after 1607. (Holmes, Common Law, 228.) The list could be expanded." [415 Ill. at 433, 114 N.E.2d at 418]

[11] Kentucky Constitution § 233:

*"General Laws of Virginia in force in this state until repealed.—* All laws which, on the first day of June, one thousand seven hundred and ninety-two, were in force in the State of Virginia, and which are of a general nature and not local to that State, and not repugnant to this Constitution, nor to the laws which have been enacted by the General Assembly of this Commonwealth, shall be in force within this State until they shall be altered or repealed by the General Assembly."

tent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature." [W.S.A. Const. Art. 14 § 13]

In *Bielski v. Schulze*, 16 Wis. 2d 1, 114 N.W.2d 105 (1962), the court decided to alter the common law rule in regard to contribution between joint tortfeasors, and was met with the contention that the foregoing provision precluded the court's right to change the common law. After a brief statement that the courts created the common law, it said:

> "In any event, we cannot adopt the view that sec. 13, art. XIV of our constitution prohibited this court from now adopting commonlaw principles or of changing them. Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis*, which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose...." [16 Wis. 2d at 11, 114 N.W.2d at 110]

The same argument was made and rejected in *State v. Esser*, 16 Wis. 2d 567, 115 N.W.2d 505 (1962), where the court was asked to change its insanity rule in criminal cases. After a lengthy quotation from Justice Cardozo's *The Nature of the Judicial Process*, which discussed the evolution of the common law as court-created law, the court stated:

> "We conclude that the function of sec. 13, art. XIV, Wis. Const., was to provide for the continuity of the common law into the legal system of the state; expressly made subject to legislative change (in as drastic degree within the proper scope of legislative power as the legislature might see fit) but impliedly subject, because of the historical course of the development of the common law, to the process of continuing evolution under the judicial power." [16 Wis. 2d at 584, 115 N.W.2d at 514]

The issue again surfaced in *Dippel v. Sciano*, 37 Wis. 2d 443, 155 N.W.2d 55 (1967), where the court had before it the same issue with which we are now faced: whether privity of contract is required in a tort product liability case. After citing its earlier cases, the court stated:

"The court's reasoning is in full accord with that expressed by the United States Supreme Court in Funk v. United States (1933), 290 U.S. 371, 383, 54 Sup. Ct. 212, 216, 78 L.Ed. 369:

" 'It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.' " [37 Wis. 2d at 457, 155 N.W.2d at 62]

See *Davison v. St. Paul Fire & Marine Insurance Co.*, 75 Wis. 2d 190, 201, 248 N.W.2d 433, 439-40 (1977); *Garcia v. Hargrove*, 46 Wis. 2d 724, 731-33, 176 N.W.2d 566, 569-70 (1970).

Perhaps there is no more eloquent and forceful expression of this principle than that found in *Ketelsen v. Stilz*, 184 Ind. 702, 111 N.E. 423, L.R.A. 1918D, 303 (1916), which construed an Indiana statute that adopted the common law made "prior to the reign of James the first. . . ." After a lengthy discussion of common law jurisprudence as a system of judge-made law, the court concluded:

"We can not believe, then, that our legislature intended to petrify the rules of the common law as declared by judicial decisions at any one time or period, and to set them up in such unflexible form as to make them absolute rules of decision throughout all time. . . . Under the section of the statute relied on where there are no governing enactments of the legislature, the courts of this State are in all matters coming before them, to endeavor to administer justice according to the promptings of reason and common sense, which are the cardinal principles of the common law, and they are not to accept blindly the decisions of the English courts of any particular time

or period without inquiring as to the reasons upon which they rest. To do so would be to adopt a practice which would be in direct violation of the theory of that common law which the statute prescribes we are to follow. . . ." [184 Ind. at 708-709, 111 N.E. at 425, L.R.A. 1918D; at 306-307]

The obvious thread running through all of these cases is that the term "common law" encompasses two components: first, a body or collection of case precedents extending from the present time back into the ancient courts of England; second, and of more importance, a system of reasoning from case to case precedent that permits the common law to grow with and adapt to changing conditions of society. This latter thought was elaborated upon by Dean Pound in *The Spirit of the Common Law* (1921):

> "The chief cause of the success of our common-law doctrine of precedents as a form of law is that it combines certainty and a power of growth as no other doctrine has been able to do. Certainty is insured within reasonable limits in that the court proceeds by analogy of rules and doctrines in the traditional system and develops a principle for the cause before it according to a known technique. Growth is insured in that the limits of the principle are not fixed authoritatively once for all but are discovered gradually by a process of inclusion and exclusion as cases arise which bring out its practical workings and prove how far it may be made to do justice in its actual operation." [p. 182]

*See generally* R. Aldisert, *The Judicial Process* (1976), at 88-169 (collecting authorities on "judge-made" law); Green, *The Thrust of Tort Law, Part II, Judicial Law Making*, 64 W.Va. L. Rev. 115 (1962).

In this statement from *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897), Justice Holmes, in his characteristically pragmatic fashion, summarized the reason why the English common law cannot be rigidly imposed as binding precedent:

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

From the foregoing discussion, it can be seen that the provisons of our Constitution, Article VIII, Section 13, and of our statute, W.Va. Code, 2-1-1, are not unique to this State, but exist in similar form in many other states. The historical purpose of such provisions was to declare what sources would initially constitute the organic law which would govern the body politic. We do not find any jurisdiction which adheres to the view that such provisions were adopted to freeze the common law for the courts as of the date the particular provision was enacted.

Certainly, many of these provisions provide, as do ours, that the legislature may alter or amend the common law, but this has never caused the courts in other jurisdictions to conclude that the silence about the courts' right to change the common law must mean that courts could not alter it.

Such a construction appears to have been considered by this Court only in some of its cases. This construction does violence to the very nature of the common law, which, as we have seen, has been judicially evolved from prior precedents and modified as necessary to meet society's changing needs. It would have been a mere redundancy to require the constitutional and statutory provisions to read "until altered or repealed by the legislature *or the courts*," since the courts *always* had the historic power to evolve and alter the common law which they created.

Based on the foregoing law, we hold that Article VIII, Section 13 of the West Virginia Constitution and W.Va. Code, 2-1-1, were not intended to operate as a bar to this Court's evolution of common law principles, including its historic power to alter or amend the common law.

## III
## GENERAL LAW OF STRICT LIABILITY
## IN TORT OF MANUFACTURER

The issue before us is whether or to what extent a third party, who has not contracted to buy the product, can recover for personal injuries occasioned by the product from the seller or manufacturer of the product in a tort action. This discussion assumes the injured party has no contract with the seller or manufacturer, and therefore enjoys no "privity" of contract.[12]

The field of product liability in tort has been well-tilled by various commentators.[13] We need only follow the main historical furrow, which began with *Winterbottom v. Wright*, 10 M.&W. 109, 152 Eng. Rep. 402 (Ex. 1842). In that case, the court established that at common law no recovery in tort could be obtained against the manufacturer of a product unless the person injured had privity of contract with the manufacturer.

In this country, *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), is generally credited with making the major breach in the privity rule by holding

---

[12] We are not concerned with the related field of implied warranty and its Uniform Commercial Code overlay, as discussed in *Dawson v. Canteen Corp.*, ____ W. Va. ____, 212 S.E.2d 82 (1975), since this area springs from contract principles.

[13] *See, e.g.,* Russell, *Manufacturers' Liability to the Ultimate Consumer*, 21 Ky. L.J. 388 (1933); James, *Products Liability (Part II)*, 34 Texas L. Rev. 192 (1955); Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960); Keeton, *Products Liability—Liability without Fault and the Requirement of a Defect*, 41 Texas L. Rev. 855 (1963); Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn. L. Rev. 363 (1965); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791 (1966); Wade, *The Continuing Development of Strict Liability in Tort*, 22 Ark. L. Rev. 233 (1968); Rheingold, *Proof of Defect in Product Liability Cases*, 38 Tenn. L. Rev. 325 (1971); Cady, *Law of Products Liability in West Virginia*, 74 W.Va. L. Rev. 283 (1972); Wade, *On the Nature of Strict Tort Liability of Products*, 44 Miss. L.J. 825 (1973); Murray, *The State of the Art Defense in Strict Products Liability*, 37 Marq. L. Rev. 649 (1974); Phillips, *The Standard for Determining Defectiveness in Products Liability*, 46 U. Cinn. L. Rev. 101 (1977).

that the user of a chattel could recover for injuries if it were negligently manufactured and inherently or imminently dangerous, even though the user had no contractual relationship with the manufacturer.

From this doctrinal stage it was not a long step to the *Restatement, Second, Torts* § 402A (1965), which obviates showing negligence in the manufacture of the product. That the product is actually defective is sufficient no matter how carefully it was manufactured.[14] The principal statement of Section 402A is:

> "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if . . . ."

A further refinement was made in *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963), which removed the Section 402A requirement that the defective product be "unreasonably dangerous." Thus, the rule in *Greenman*[15] is:

---

[14] Section 402A continues with the following qualifications:

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"The rule stated ... applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

[15] Initially some commentators were of the view that *Greenman* merely adopted Section 402A. W. Prosser, *The Law of Torts* (4th ed. 1971) § 98, at 657; Annot., 13 A.L.R.3d 1057, 1065 (1967); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 829 (1973); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, 802-804 (1966). Any doubts on this issue were put to rest by *Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972), where the court stated:

"In summary, we have concluded that to require an injured plaintiff to prove not only that the product contained a defect but also that such defect made the product unreasonably dangerous to

"A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. Recognized first in the case of unwholesome food products, such liability has now been extended to a variety of other products that create as great or greater hazards if defective. ..." [59 Cal. 2d at 62, 27 Cal. Rptr. at 700, 377 P.2d at 900, 13 A.L.R.3d at 1054]

Most courts and commentators refer to either the 402A rule or the *Greenman* principle as "strict liability in tort." This is somewhat unfortunate, as it tends to create the impression that under either rule the manufacturer is always liable. The term also creates confusion with the traditional common law rule of "strict liability" arising from *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868), *aff'g* L.R. 1 Ex. 265 (1866), which fixes absolute liability for perilous activities or conditions conducted on one's property which escape control and damage another's property or person. The Wisconsin court in *Dippel v. Sciano*, 37 Wis. 2d 443, 155 N.W.2d 55 (1967), discussed this point:

"The term *strict* liability in tort might be misconstrued and, if so, would be a misnomer. Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability. From the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts." [Emphasis in original] [37 Wis. 2d at 459-60, 155 N.W.2d at 63]

The term "strict liability in tort" is so imbedded in the judicial decisions and commentaries in the field of product liability that little would be gained by adopting a

the user or consumer would place a considerably greater burden upon him than that articulated in *Greenman.* ..." [8 Cal.3d at 134-35, 104 Cal. Rptr. at 443, 501 P.2d at 1163]

new term. It appears settled, however, that the term does not impose absolute liability or make the manufacturer an insurer of his product. *E.g., Beetler v. Sales Affiliates, Inc.,* 431 F.2d 651, 653 (7th Cir. Ill. 1970); *Helene Curtis Industries, Inc. v. Pruitt,* 385 F.2d 841, 849 (5th Cir. 1967), *cert. denied,* 391 U.S. 913, 20 L. Ed. 2d 652, 88 S.Ct. 1806 (1968) (construing Texas and Oklahoma law); *Guglielmo v. Klausner Supply Co.,* 158 Conn. 308, 315-16, 259 A.2d 608, 612 (1969); *Magnuson v. Rupp Manufacturing, Inc.,* 285 Minn, 32, 44-45, 171 N.W.2d 201, 211 (1969); *State Stove Manufacturing Co. v. Hodges,* 189 So.2d 113, 120-21 (Miss. 1966), *cert. denied,* 386 U.S. 912, 17 L. Ed. 2d 784, 87 S.Ct. 860 (1967); *Worrell v. Barnes,* 87 Nev. 204, 206, 484 P.2d 573, 575 (1971); *Hoven v. Kelble,* 79 Wis. 2d 444, 460, 256 N.W.2d 379, 387 (1977).

The cause of action covered by the term "strict liability in tort" is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability.

## IV
## WEST VIRGINIA LAW OF STRICT LIABILITY IN TORT

The concept of strict liability in tort for a defective product is not foreign to this State. Perhaps our earliest case, and certainly one of our best, is *Peters v. Johnson, Jackson & Co.,* 50 W. Va. 644, 41 S.E. 190 (1902), where a plaintiff who used a drug but had not purchased it was permitted to recover damages in a tort action against the druggist. Judge Brannon, speaking for a unanimous Court, made the distinction between a contract and a tort remedy:

> "Where the action is only for the breach of a contract, only the parties to it, or their privies, can maintain it. Strangers cannot sue for its negligent breach. Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621; 1 Sherm. & Redfield on Negligence s. 116; 2 Jag. on Torts s. 260. But where in

a given transaction the law puts upon a person the duty to so act that he does not harm others, independent of a contract, he is liable to third parties, even though executing a contract made with a particular person, if he harms others by negligence. . . ." [50 W. Va. at 647, 41 S.E. at 191]

The Court then proceeded to fix a general tort product liability rule, which not only anticipated by some fourteen years Cardozo's reasoning in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), but surpassed it and reached the 402A rule in the following emphasized language:

> "We say that, as the authorities cited show, a third party, *a stranger to the sale, can only sue when the thing used,* or the negligent act, *is very dangerous to human life* and injury may reasonably be expected to happen to others therefrom." [50 W. Va. at 651-52, 41 S.E. at 193] [Emphasis supplied]

It is clear that *Peters* did not limit its rule to dangerous food or drugs, since it included the following statements involving manufactured products:

> "In Langridge v. Levy, 2 Mees. & W. 519, 4 *Id.* 337, A bought a defective gun which was warranted, and gave it to B, who was hurt by its explosion; it was held B could sue the seller. The principle was applied to persons contracting to build scaffolds, to repair buildings, by holding them liable for defects to workmen using the scaffolds, not employed by such contractor, though there was no privity of contract between them. Coughtry v. Globe Co., 56 N. Y. 124, 15 Am. R. 387; Devlin v. Smith, 89 N. Y. 470; 42 Am. R. 315. So where a mechanic made bad repair to a gas meter which injured a servant in the house. Parry v. Smith, 4 C. P. Div. 325, cited in note in 42 Am. R. 315. The text books lay it down as law. 1 Thompson on Neg. s. 817; Cooley, Torts, 82; Wharton, Neg. s. 91; 2 Jag. s. 261. . . ." [50 W. Va. at 650, 41 S.E. at 192]

While *Peters* was a tort action against the seller of the product, the case of *Webb v. Brown & Williamson Tobacco Co.* 121 W. Va. 115, 2 S.E.2d 898 (1939), involved the manufacturer of a plug of chewing tobacco. The plaintiff's son had bought the tobacco, which contained a foreign substance, and in upholding the manufacturer's liablity without the necessity of privity, this Court stated:

> "The proposition that the manufacturer, packer or bottler of food products is liable to a consumer thereof for injury caused by unwholesomeness or unfitness of such product, although purchased from a retailer, seems to be well established by the authorities." [121 W. Va. at 118, 2 S.E.2d at 899]

*Webb* also permitted the use of the Doctrine of *Res Ipsa Loquitur* to establish negligence against the manufacturer. This rule was later followed in the first syllabus of *Parr v. Coca-Cola Bottling Works*, 121 W. Va. 314, 3 S.E.2d 499 (1939), and in the first syllabus of *Blevins v. Raleigh Coca-Cola Bottling Works*, 121 W. Va. 427, 3 S.E.2d 627 (1939):

> "Proof that a bottling company through a distributor caused to be sold a bottle of coca-cola containing a harmful substance which was consumed by the purchaser, resulting in his injury, gives rise to a *prima facie* presumption of negligence on the part of the bottling company and it is for the jury to determine whether, under all the circumstances, proof of a careful bottling system followed by the defendant company, which does not single out the specific article distributed and consumed, meets the presumption so arising."

Another step in the evolution of our tort product liability law was *Ferrell v. Royal Crown Bottling Co.*, 144 W. Va. 465, 109 S.E.2d 489 (1959), which held the manufacturer-bottler liable in tort for injuries to a patron at a store. The patron was injured when a soft drink bottle on a shelf exploded. There was no privity of contract and

the Court permitted a verdict submitted under the Doctrine of *Res Ipsa Loquitur* to stand.[16] This case is of significance because the product, a soft drink bottle, was similar to any other manufactured product. In fact, *Ferrell* cites with approval the following product liability cases: *Chanin v. Chevrolet Motor Co.* 89 F.2d 889, 111 A.L.R. 1235 (7th Cir. 1937), and *Baxter v. Ford Motor Co.* 168 Wash. 456, 12 P.2d 409, *aff'd en banc*, 15 P.2d 1118, 88 A.L.R. 521 (1932) (automobile windshield); *Heckel v. Ford Motor Co.*, 101 N.J.L. 385, 128 A. 242, 39 A.L.R. 989 (Ct. of Err. & App. 1925) (pulley attached to tractor).

*Ferrell* was followed by *Williams v. Chrysler Corp.*, 148 W.Va. 655, 137 S.E.2d 225 (1964), where the purchaser of an automobile was sued by a guest passenger who also sued the dealer and the car manufacturer. The purchaser cross-claimed against the manufacturer on a negligence theory. The exact nature of the cross claim is not disclosed in the case, but the Court framed these issues to be controlling:

> "Thus the issues presented on this appeal are whether the language in the purchase contract heretofore quoted is sufficient to bar a negligence claim by a purchaser against a manufacturer and, if not, whether appellant may recover on such a claim in the absence of privity." [148 W. Va. at 658, 137 S.E.2d at 227]

The purchase contract language referred to contained a broad disclaimer of liability on which the case was ultimately resolved. The Court, however, made this observation about the exceptions to *Winterbottom v. Wright*, 10 M.&W. 109, 152 Eng. Rep. 402 (Ex. 1842), in our jurisdiction:

---

[16] It seems apparent that this Court adopted the *Res Ipsa Loquitur* Doctrine as a means of supplying some evidence of negligence on the part of the manufacturer or seller—a requirement no longer essential in the tort product liability law, where the focus is the "defective" product. Wade, *A Conspectus of Manufacturers' Liability for Products*, 10 Ind. L. Rev. 755, 758-59 (1977). Our later case of *Walton v. Given*, ___ W. Va. ___, 215 S.E.2d 647 (1975), illustrates the limited usefulness of this doctrine where there is divided control over the product.

"The most general of these exceptions, and one apparently adopted by this Court, is to the effect that the seller of a chattel owes to any person who might be expected to use it a duty of reasonable care in its manufacture if the chattel is 'inherently' or 'imminently' dangerous...." [148 W. Va. at 659, 137 S.E.2d at 228]

The Court went on to conclude that "the express warranty or disclaimer between the parties is controlling and ... this action cannot be maintained." [148 W. Va. at 665, 137 S.E.2d at 231] It cited two earlier cases for the proposition that a party to a contract may limit his liability so long as he is not a common carrier or the negligence is not gross or wilful: *Dunham v. Western Union Telegraph Co.*, 85 W. Va. 425, 102 S.E. 113 (1920), and *Zouch v. Chesapeake and Ohio Railway*, 36 W. Va. 524, 15 S.E. 185 (1892).

The rather narrow holding in *Williams* is simply not sustainable under the law of strict liability in tort for two reasons. First, the ultimate user of the product generally does not have privity of contract with the manufacturer, and therefore there will be no applicable contractual disclaimer. Second, and of greater importance, under tort product liability law there can be no disclaimer limitation since such disclaimers are contractual defenses which are not applicable to a cause of action founded on strict liability in tort. *E.g.*, *Sterner Aero AB v. Page Airmotive, Inc.* 499 F.2d 709, 713 (10th Cir. Okla. 1974); *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 88 (Fla. 1976); *Whitaker v. Farmhand, Inc.*, 567 P.2d 916, 922 (Mont. 1977); *Elliott v. Lachance*, 109 N.H. 481, 484, 256 A.2d 153, 156 (1969); *Pearson v. Franklin Laboratories, Inc.*, 254 N.W.2d 133, 138-39 (S.D. 1977); *Dippel v. Sciano*, 37 Wis. 2d 443, 459-60, 155 N.W.2d 55, 63 (1967).

From this review of our tort product liability cases, it is apparent that while we have not been in the vanguard of the movement, neither have we languished in the rear. Certainly *Peters*, *Webb* and *Ferrell* demonstrate a keen sense of the vital developments in the tort product liability field. They demonstrate that privity of con-

tract was never a bar in this State to a tort action against the manufacturer. Moreover, the utilization of the Doctrine of *Res Ipsa Loquitur* in effect permitted proof of the defect along with its being the proximate cause of the injury as a sufficient factual basis for recovery.

Our rule is therefore not substantially different from either Section 402A or *Greenman,* as the key component of each is to remove the burden from the plaintiff of establishing in what manner the manufacturer was negligent in making the product. Once it can be shown that the product was defective when it left the manufacturer and that the defect proximately caused the plaintiff's injury, a recovery is warranted absent some conduct on the part of the plaintiff that may bar his recovery.

The problem has always been to evolve a suitable definition of the term "defect," since most courts hold that the manufacturer is not an insurer of his product. Criticism has been leveled by courts and commentators against Section 402A because it purports to define a defective product in terms of what is "unreasonably dangerous" to "the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Restatement, Second, Torts* § 402A Comment i.[17] This definition is claimed to inject a concept of foreseeability into the tort product liability law which is inappropriate, since the manufacturer's liability is not based on negligence and the issue of foreseeability is a part of negligence law. Furthermore, it is asserted that by using the phrase "with the ordinary knowledge ... as to its characteristics," the plaintiff is

---

[17] *See, e.g., Cronin v. J.B.E. Olson Corp.* 8 Cal. 3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972); *Glass v. Ford Motor Co.* 123 N.J. Super. 599, 304 A.2d 562 (1973); *Palmer v. Massey-Ferguson, Inc.,* 3 Wash. App. 508, 476 P.2d 713, 718-19 (1970); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 830-31 (1973); Phillips, *The Standard for Determining Defectiveness in Products Liability,* 46 U. Cinn. L. Rev. 101 (1977); Polelle, *The Foreseeability Concept and Strict Products Liability: The Odd Couple of Tort Law,* 8 Rutgers Camden L.J. 101 (1976).

barred from recovering if there is an obvious defect in the product under the foreseeability concept.

Despite criticism of Section 402A's formulation of the term "defect." there has been a notable lack of uniformity by courts in reaching a definition of the term. This is understandable, since the term "defect" must cover an enormous number of products which may be defectively manufactured for a variety of reasons. The California court, in *Greenman* and in *Cronin v. J.B.E. Olson Corp.,* 8 Cal. 3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972), did not attempt any explanation of the term "defect," as it acknowledged in note 16 of *Cronin*:

> "We recognize, of course, the difficulties inherent in giving content to the defectiveness standard. However, as Justice Traynor notes, 'there is not a cluster of useful precedents to supersede the confusing decisions based on indiscriminate invocation of sales and warranty law.' (Traynor, *supra*, 32 Tenn. L.Rev. 363, 373.)" [8 Cal. 3d at 134, 104 Cal. Rptr. at 442, 501 P.2d at 1162]

It was not until *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), that the court attempted a concrete definition of the term "defect." It first defined a manufacturing defect, and then a design defect:

> "In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect. . . ." [20 Cal. 3d at 429, 143 Cal. Rptr. at 236, 573 P.2d at 454]

> . . . .

> "We hold that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an

intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." [20 Cal. 3d at 435, 143 Cal. Rptr. at 239-40, 573 P.2d at 457-58]

Illinois offers a single test for a defective product which appears like Section 402A, "that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control," *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 623, 210 N.E.2d 182, 188 (1965), until the court states how this is proved, as illustrated in *Gillespie v. R. D. Werner Co.*, 71 Ill. 2d 318, 17 Ill. Dec. 10, 375 N.E.2d 1294, 1295-96 (1978):

> "In *Tweedy* [*Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 574, 2 Ill. Dec. 282, 285, 357 N.E.2d 449, 452 (1976)], this court held that a *'prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed "to perform in the manner reasonably to be expected in light of [its] nature and intended function." ' "

Under either the California or the Illinois standard, it would seem that if the plaintiff can show he was using the product in a normal manner and was injured, the defective condition is then proved.

New Jersey, in *Cepeda v. Cumberland Engineering Co., Inc.*, 76 N.J. 152, 386 A.2d 816 (1978), has adopted what it terms the "risk/utility analysis" proposed by Dean Keeton[18] and Dean Wade,[19] consisting of seven factors which should be weighed to determine if the product is defec-

---

[18] Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, 37-38 (1973).

[19] Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 834-35 (1973).

tive.[20] The court in *Cepeda* suggests it is following Section 402A when it substitutes the term "defective condition unreasonably dangerous" for the term "not duly safe" suggested by Dean Wade for a model instruction:

> " 'A [product] is not duly safe if it is so likely to be harmful to persons [or property] that a reasonable prudent manufacturer [supplier], who had actual knowledge of its harmful character would not place it on the market. It is not necessary to find that this defendant had knowledge of the harmful character of the [product] in order to determine that it was not duly safe.' " [76 N.J. at ____, 386 A.2d at 827, *quoting from* Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, (39-40 (1973)]

It is difficult to determine whether the *Cepeda* rule is limited only to design defect cases. Certainly the Wade instruction is not so limited. The New Jersey court does say in *Cepeda* that the risk/utility analysis "rationalizes what the great majority of the courts actually do in deciding design defect cases. ..." [76 N.J. at ____, 386 A.2d at 826] The court also suggested that the seven-factor risk/utility analysis (note 20, *supra* at 31] is not easily susceptible to a jury instruction.

---

[20] "(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

"(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

"(3) The availability of a substitute product which would meet the same need and not be as unsafe.

"(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

"(5) The user's ability to avoid danger by the exercise of care in the use of the product.

"(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

"(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." [76 N.J. at ____, 386 A.2d at 826-27]

We believe that a risk/utility analysis does have a place in a tort product liability case by setting the general contours of relevant expert testimony concerning the defectiveness of the product. In a product liability case, the expert witness is ordinarily the critical witness. He serves to set the applicable manufacturing, design, labeling and warning standards based on his experience and expertise in a given product field.

Through his testimony the jury is able to evaluate the complex technical problems relating to product failure, safety devices, design alternatives, the adequacy of warnings and labels, as they relate to economic costs. In effect, the expert explains to the jury the risk/utility standards and gives the jury reasons why the product does or does not meet such standards, which are essentially standards of product safeness.[21]

We agree with the following statement by Dean Wade, that what is a defective product must be analyzed in traditional tort terminology, much in the manner of our earlier cases:

> "The time has now come to be forthright in using a tort way of thinking and tort terminology [in cases of strict liability in tort]. There are several ways of doing it, and it is not difficult. The simplest and easiest way, it would seem, is to assume that the defendant knew of the dangerous condition of the product and ask whether he was then negligent in putting it on the market or supplying it to someone else. In other words, the scienter is supplied as a matter of law, and there is no need for the plaintiff to prove its existence as a matter of fact. . . ."
> [Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 834-35 (1973)]

---

[21] The role of experts is discussed by W. Dohaner, H. Piehler, A. Twerski and A. Weinstein in *The Technological Expert in Products Liability Litigation*, 52 Texas L. Rev. 1303 (1974). The problem of "defectiveness" parallels to some degree "the diseased and defective condition of the mind" for insanity, where a generalized standard is given content by expert testimony and ultimately applied through the medium of the collective common sense of the jury.

We also recognize that in this opinion we cannot formulate a solution for every problem that may arise in future product liability cases. We do state that the cause of action rests in tort, and that the initial inquiry, in order to fix liability on the manufacturer, focuses on the nature of the defect and whether the defect was the proximate cause of plaintiff's injury. We recognize that a defective product may fall into three broad, and not necessarily mutually exclusive, categories: design defectiveness; structural defectiveness; and use defectiveness arising out of the lack of, or the inadequacy of, warnings, instructions and labels.

Characteristically, under the first two categories of defectiveness the inquiry centers on the physical condition of the product which renders it unsafe when the product is used in a reasonably intended manner. In the third category of defectiveness the focus is not so much on a flawed physical condition of the product, as on its unsafeness arising out of the failure to adequately label, instruct or warn.

The term "unsafe" imparts a standard that the product is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to economic costs, at the time the product was made.

We thus conclude in this jurisdiction that the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.[22]

---

[22] This rule applies to both the manufacturer and the seller, who are engaged in the business of selling such product which is expected to and does reach the user without substantial change in the condition in which it was sold. Most courts recognize that a seller

The question of what is an intended use of a product carries with it the concept of all those uses a reasonably prudent person might make of the product, having in mind its characteristics, warnings and labels. Prosser discussed the principle in his *Law of Torts* (4th ed. 1971) at 668-69:

> "[T]he seller is entitled to expect a normal use of his product, and is not liable when it is put to an abnormal one. This too has been carried over to strict liability. On either basis, the seller is not liable when the product is materially altered before use, or is combined with another product which makes it dangerous, or is mishandled, or used in some unusual and unforeseeable way, as when a wall decorating compound is stirred with the finger, or nail polish is set on fire, or an obstinate lady insists on wearing shoes two sizes too small. The seller is entitled to have his due warnings and instructions followed; and when they are disregarded, and injury results, he is not liable."

The issue of appropriate use of the product has as a counterpart the defense of abnormal use, which may at times carry companion defenses of contributory negligence and assumption of risk on the part of the user.[23] In tort product liability cases, it is generally held, following Comment n of Section 402A, that: "Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the

---

who does not contribute to the defect may have an implied indemnity remedy against the manufacturer, when the seller is sued by the user. *Good v. A. B. Chance Co.*, 565 P.2d 217, 227 (Colo. App. 1977); *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill. 2d 17, 20-21, 329 N.E.2d 785, 786-87 (1975); *Kroger Co. v. Bowman*, 411 S.W.2d 339, 342-43 (Ky. 1967); *Newmark v. Gimbel's, Inc.*, 54 N.J. 585, 600, 258 A.2d 697, 705 (1969); *Smith Radio Communications, Inc. v. Challenger Equipment, Ltd.*, 270 Ore. 322, 527 P.2d 711 (1974); Annot., 28 A.L.R.3d 943, 975 (1969) (Supp.).

[23] Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk*, 25 Vand. L. Rev. 93, 95 (1972); Vargo, *The Defenses to Strict Liability in Tort: A New Vocabulary with an Old Meaning*, 29 Mercer L. Rev. 447 (1978).

defect in the product, or to guard against the possibility of its existence." *See, e.g., Luque v. McLean,* 8 Cal. 3d 136, 145, 104 Cal. Rptr. 443, 449-50, 501 P.2d 1163, 1169-70 (1972); *Shields v. Morton Chemical Co.,* 95 Idaho 674, 677, 518 P.2d 857, 860 (1974); *Reese v. Chicago, Burlington & Quincy Railroad,* 55 Ill. 2d 356, 360, 303 N.E.2d 382, 385 (1973); *Perfection Paint & Color Co. v. Konduris,* 147 Ind. App. 106, 118-19, 258 N.E.2d 681, 688-89 (1970); *Hawkeye Security Insurance Co. v. Ford Motor Co.,* 199 N.W.2d 373, 380 (Iowa 1972); *Brooks v. Dietz,* 218 Kan. 698, 704-705, 545 P.2d 1104, 1110 (1976); *Hawkins Construction Co. v. Matthews Co.,* 190 Neb. 546, 566-67, 209 N.W.2d 643, 655 (1973); *Rice v. Hyster Co.* 273 Ore. 191, 204, 540 P.2d 989, 995 (1975); *Ellithorpe v. Ford Motor Co.* 503 S.W.2d 516, 521 (Tenn. 1973); *Henderson v. Ford Motor Co.,* 519 S.W.2d 87, 89 (tex. 1974).

It does appear that the defense of assumption of risk is available against the plaintiff, where it is shown that with full appreciation of the defective condition he continues to use the product. The hallmark of this defense is actual knowledge on the part of the plaintiff. *See, e.g., Williams v. Brown Manufacturing Co.,* 45 Ill. 2d 418, 424-27, 261 N.E.2d 305, 309-310, 46 A.L.R.3d 226, 233-35 (1970); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1366-67 (Okla. 1974); *Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex. 1975).

To this defense, some courts have added the further requirement that the plaintiff's conduct in proceeding to use the admittedly defective product must be unreasonable. *See, e.g., Butaud v. Suburban Marine & Sporting Goods, Inc.,* 543 P.2d 209, 211-12, 81 A.L.R.3d 384, 389 (Alaska 1975); *O. S. Stapley Co. v. Miller,* 103 Ariz. 556, 561, 447 P.2d 248, 252-53 (1968); *Luque v. McLean, supra,* 8 Cal. 3d at 145, 104 Cal. Rptr. at 449-50, 501 P.2d at 1169-70; *Hiigel v. General Motors Corp.,* 190 Colo . 57, 64, 544 P.2d 983, 988 (1975); *Brooks v. Dietz, supra,* 218 Kan. at 704-705, 545 P.2d at 1110; *Johnson v. Clark Equipment Co.,* 274 Ore. 403, 409-410, 547 P.2d 132, 138 (1976); *Haugen v. Minnesota Mining & Manufacturing Co.,* 15 Wash. App. 379, 550 P.2d 71, 75 (1976).

The difference between these two positions may be more theoretical than real, since in many instances a plaintiff who has full knowledge of the defective condition, and yet proceeds to use the product, will be acting unreasonably.

In conclusion, we find that the rule expressed in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963), permitting recovery in a tort product liability case, where a defective product causes personal injury, is a more appropriate rule than Section 402A of the *Restatement, Second, Torts* (1965), which requires the defective condition to be unreasonably dangerous. We acknowledge that our definition of a defective condition differs from that followed by the California court in *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), in that ours is somewhat more restrictive.

We are asked in the final part of the certification whether the power saw is an inherently dangerous product under the *Rylands v. Fletcher* Doctrine, which declared that those conditions or activities which are intrinsically dangerous will result in liability even though there is no proof of any negligence. The doctrine originally arose from cases involving dangerous activities conducted on one's property which escaped control and damaged others in their person or property. We have recognized the *Rylands* Doctrine in several cases, but none involved a product placed in commerce. *See, e.g., Whitney v. Ralph Myers Contracting Corp.*, 146 W. Va. 130, 118 S.E.2d 622 (1961) (blasting operations); *Weaver Mercantile Co. v. Thurmond*, 68 W. Va. 530, 70 S.E. 126 (1911) (water escaping from tanks).

We are not cited, nor have we found, any authority which suggests that the *Rylands v. Fletcher* Doctrine has been imported wholesale into the product liability field. Its essential characteristic is that the activity or object is abnormally or exceptionally dangerous. W. Prosser, *The Law of Torts* (4th ed. 1971) § 78. In the ordinary product liability case, the product, if safely

made, is not dangerous, but becomes so only by virtue of a defect.

*Rylands* looks only to the resulting harm and creates absolute liability on the part of the defendant and no negligence or defect need be shown. The defendant is an insurer—a standard which the overwhelming majority of courts refuses to impose on the manufacturer of a product. *Beetler v. Sales Affiliates, Inc.*, 431 F.2d 651, 653 (7th Cir. Ill. 1970); *Helene Curtis Industries, Inc. v. Pruitt*, 385 F.2d 841, 849 (5th Cir. 1967), *cert. denied*, 391 U.S. 913, 20 L. Ed. 2d 652, 88 S.Ct. 1806 (1968) (construing Texas and Oklahoma law); *Guglielmo v. Klausner Supply Co.*, 158 Conn. 308, 315-16, 259 A.2d 608, 612 (1969); *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 44-45, 171 N.W.2d 201, 211 (1969); *State Stove Manufacturing Co. v. Hodges*, 189 So.2d 113, 120-21 (Miss. 1966), *cert. denied*, 386 U.S. 912, 17 L. Ed. 2d 784, 87 S.Ct. 860 (1967); *Worrell v. Barnes*, 87 Nev. 204, 206, 484 P.2d 573, 575 (1971); *Hoven v. Kelble*, 79 Wis. 2d 444, 460, 256 N.W.2d 379, 387 (1977). We thus decline to adopt the *Rylands v. Fletcher* Doctrine into our tort product liability law.

The certified questions having been answered, this case is dismissed from the docket.

*Answered and*
*dismissed.*