## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

KENNETH GOLDSBOROUGH AND MARY GOLDSBOROUGH,
Petitioners

vs.) No. 13-1323  (Kanawha County 10-C-1170)

BUCYRUS INTERNATIONAL, INC.; BUCYRUS AMERICA, INC.;
BUCYRUS MINING EQUIPMENT, INC.; AND
STRUCTURED MINING SYSTEMS, INC.,
Respondents

**FILED**

**June 9, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### MEMORANDUM DECISION

The petitioners herein, Kenneth and Mary Goldsborough ("Mr. and Mrs. Goldsborough"),[1] appeal from two orders entered November 15, 2013, by the Circuit Court of Kanawha County.  By those orders, the circuit court granted summary judgment to the respondents herein, Bucyrus International, Inc.; Bucyrus America, Inc.; and Bucyrus Mining Equipment, Inc. (collectively, "Bucyrus"), and to the respondent herein, Structured Mining Systems, Inc. ("Structured Mining").[2]  On appeal to this Court, Mr. and Mrs. Goldsborough contend that the circuit court erred by granting the respondents' summary judgment motions because it misapplied the governing law regarding strict liability in West Virginia and failed to recognize that disputed issues of material fact exist so as to preclude summary judgment.

Upon our review of the parties' arguments, the appendix record, and the pertinent authorities, we agree with the petitioners that the circuit court erred by granting the respondents' motions for summary judgment.  Therefore, we reverse the November 15, 2013, orders of the Kanawha County Circuit Court and remand this case for further proceedings consistent with this memorandum decision.  In summary, we find that the circuit court failed to recognize that genuine issues of material fact exist in this case so as to render summary judgment improper.  Because this case does not present a new or significant issue of law, and

---

[1]Mr. and Mrs. Goldsborough are represented herein by Allan N. Karlin, Jane E. Peak, Sarah W. Montoro, and Harrison P. Case.

[2]Bucyrus and Structured Mining are represented herein by Mark D. Shepard, Mark K. Dausch, Matthew S. Casto, James H. Keale, and Lisa L. Lilly.

1

for the reasons set forth herein, we find this case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is proper for disposition as a memorandum decision.

The instant proceeding originated when Mr. Goldsborough sustained an injury at work on June 27, 2008, while operating a remotely-controlled continuous miner at Wolf Run Mining Company's Sentinel mine.[3]  The continuous miner was manufactured by Bucyrus, and the continuous miner's remote control operating system was manufactured by Structured Mining.  This particular mining equipment was designed to use "teach-learn" technology in which one specific remote control transmitter was activated to work one specific continuous miner machine.  At the relevant time, two different continuous miner machines, each operated by their own remote control transmitter, were being used in the pertinent section of the mine.

On the day of his accident, Mr. Goldsborough, a coal miner with thirty-five years of coal mining experience, was using a remote control transmitter to operate its associated continuous miner to mine coal in the Number 3 entryway of the Number 1 section of the mine.  A ventilation curtain was hung in the entryway, behind which sat two of Mr. Goldsborough's coworkers who were waiting for him to finish mining that area and move the continuous miner so they could enter and install roof bolts.

While attempting to back the continuous miner away from the entryway, its cutter head became caught on the ventilation curtain.  Mr. Goldsborough recalls using the remote control transmitter to turn off power to the continuous miner's cutter heads, hydraulic pump, and tram motors; he reports that he then walked around the miner and between the machine and the wall of the mine to free the entangled ventilation curtain.  According to Mr. Goldsborough, after disentangling the ventilation curtain and while walking back to his original position, he felt the continuous miner machine strike him and pin him between the machine and the mine wall.  Mr. Goldsborough indicated that he attempted to turn the continuous miner off with its remote control transmitter, but that he was unable to do so because the remote control had become trapped between him and the machine. Coworkers, including those sitting behind the ventilation curtain, heard Mr. Goldsborough's cries for help and eventually freed him.  As a result of this incident, Mr. Goldsborough sustained crushing injuries to his left leg and internal organs.

---

[3]In their lawsuit giving rise to the case *sub judice*, Mr. and Mrs. Goldsborough also named as defendants Wolf Run Mining Company; Hunter Ridge Coal Company; ICG, Inc.; and ICG, LLC.  However, none of these defendants are parties to the instant appeal.

On the day of this incident, investigators from both the federal Mine Safety and Health Administration ("MHSA") and the West Virginia Office of Miners' Health, Safety and Training ("WVOMHST") inspected the scene and interviewed Mr. Goldsborough's coworkers. However, during the course of their investigations on June 27, 2008, neither of these agencies retrieved either the computer memory card from the continuous miner machine that Mr. Goldsborough had been operating or the remote control transmitter that he had been using. Three days later, on June 30, 2008, MSHA recovered both the continuous miner's computer memory card and the machine's associated remote control transmitter. While the continuous miner's computer memory card contained other data recorded at and around the time of Mr. Goldsborough's accident, MSHA reported that both the voltage information and "Errors" file records for the relevant time were missing from the machine's memory card.

Thereafter, Mr. and Mrs. Goldsborough filed the lawsuit giving rise to the instant proceeding against the respondents herein, and additional parties,[4] alleging that "the continuous miner moved, without any action by Kenneth Goldsborough, and crushed him against the mine rib causing him severe and permanent injury." In their complaint, the Goldsboroughs asserted claims against the respondents herein for strict product liability, negligence, breach of warranty, and loss of consortium. Following discovery, Bucyrus and Structured Mining moved for summary judgment.

By order entered November 15, 2013, the circuit court granted Bucyrus' motion for summary judgment. In so ruling, the circuit court determined that the Goldsboroughs had not presented sufficient evidence, either circumstantial or direct, to prove that the continuous miner machine or its associated remote control transmitter were defective or that the respondents had negligently caused Mr. Goldsborough's injuries. The circuit court also rejected Mr. Goldsborough's breach of warranty claim and his contention that genuine issues of material fact existed so as to preclude summary judgment. Insofar as Mrs. Goldsborough's claim for loss of consortium was derivative of the claims asserted by Mr. Goldsborough, the circuit court found that, because Mr. Goldsborough had not sufficiently proven his claims, Mrs. Goldsborough's claim also must fail.

Employing the same reasoning, the circuit court entered a second order, also on November 15, 2013, awarding summary judgment to Structured Mining. From these adverse rulings, Mr. and Mrs. Goldsborough appeal to this Court.

The instant matter is before this Court on appeal from the circuit court's orders

---

[4]*See supra* note 3.

3

awarding summary judgment to the respondents herein. Pursuant to Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Thus, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963). Where, as here, an appeal is taken from a circuit court's entry of summary judgment, we employ a plenary review: "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

In their appeal to this Court, Mr. and Mrs. Golsborough assign two[5] main errors: (1) the circuit court misapplied the law governing strict liability for defective products and (2) the circuit court failed to recognize that there exist genuine issues of material fact so as to preclude summary judgment. Because resolution of the propriety of summary judgment issue will instruct our determination of the strict liability assignment of error, we first will consider whether summary judgment was proper in this case.

Mr. and Mrs. Goldsborough first assign error to the circuit court's conclusion that Bucyrus and Structured Mining were entitled to summary judgment because there did not exist any genuine issues of material fact in this case. Upon our plenary review, we find the circuit court erred in this ruling because the existence of genuine issues of material fact render summary disposition of this case improper. As we previously have held, "[i]f there is no genuine issue as to any material fact summary judgment should be granted *but such judgment must be denied if there is a genuine issue as to a material fact*." Syl. pt. 4, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (emphasis added).

> Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

Syl. pt. 5, *Jividen v. Law*, 194 W. Va. 705, 461 S.E.2d 451 (1995). Thus, "[t]he question to

---

[5]*See infra* note 6.

4

be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl. pt. 5, *Aetna*, 148 W. Va. 160, 133 S.E.2d 770.

In determining whether such a genuine issue of material fact exists, we also have instructed that all inferences to be drawn from the evidence should be made in the nonmovant's, *i.e.*, Mr. Goldsborough's, favor. Because "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial," Syl. pt. 3, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755, "[w]e, therefore, must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter*, 192 W. Va. at 192, 451 S.E.2d at 758 (citations omitted). Thus, "[a] party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and *any doubt as to the existence of such issue is resolved against the movant for such judgment*." Syl. pt. 6, *Aetna*, 148 W. Va. 160, 133 S.E.2d 770 (emphasis added).

With specific respect to the case *sub judice*, we previously have considered the evidence a plaintiff must present to overcome a defendant's summary judgment motion with regard to a claim for strict liability. In *Bennett v. Asco Services, Inc.*, 218 W. Va. 41, 621 S.E.2d 710 (2005) (per curiam), we explained that,

> [u]nder *Anderson* [*v. Chrysler Corp.*, 184 W. Va. 641, 403 S.E.2d 189 (1991)], while a defect in a product cannot be presumed solely from the fact that an accident occurred, proof that a product malfunctioned–that is, failed to function as it was intended and typically would in normal usage–is circumstantial proof of its defective condition. *Anderson* does not require a plaintiff, to succeed at the summary judgment stage, to conclusively eliminate all possible contributing causes other than a defect for an accident. Instead, *a plaintiff is only required to submit evidence that has the capacity to sway the outcome of the litigation, and from which a jury could fairly conclude that the most likely explanation of the accident involves the causal contribution of a product defect.*

*Bennett*, 218 W. Va. at 48, 621 S.E.2d at 717 (emphasis added). This recognition is consistent with our jurisprudence holding that

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

5

Syl. pt. 4, *Painter*, 192 W. Va. 189, 451 S.E.2d 755. *Accord* Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995) ("Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.").

> [W]hile the underlying facts and all inferences are viewed in the light most favorable to the nonmoving party, the nonmoving party must nonetheless offer some "'concrete evidence from which a reasonable . . . [finder of fact] could return a verdict in . . . [its] favor'" or other "'significant probative evidence tending to support the complaint.'"

*Painter*, 192 W. Va. at 193, 451 S.E.2d at 759 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S. Ct. 1575, 1593, 20 L. Ed. 2d 569 (1968))) (additional citation omitted).

From the appendix record presented for our consideration, it is apparent that the Goldsboroughs have presented several pieces of concrete evidence from which more than one inference may be made raising genuine issues of material fact. In support of his strict liability claim, Mr. Goldsborough presented the repair records for the remote control transmitter he had been using at the time of the accident. These repair records indicated that the same device had been repaired in each of the two months immediately preceding his injury and that, following his accident, the transmitter had evidence of internal water damage. The inferences to be drawn from this evidence are to be construed in the nonmovant's, *i.e.*, Mr. Goldsborough's favor, and raise a genuine issue of material fact as to whether the subject remote control transmitter was defective.

Likewise, Mr. Goldsborough presented evidence regarding the continuous miner machine he was using at the time of his accident. This evidence also raises a genuine issue of material fact as to whether the machine was defective insofar as the voltage and error information files for the time of Mr. Goldsborough's accident are inexplicably absent from the continuous miner's computer memory card despite the fact that the memory card recorded significant error data on the day before the accident and recorded other types of data at the time of Mr. Goldsborough's injury. Again, inferences as to whether the teach-learn technology of the continuous miner machine malfunctioned on the day of the accident, and as to why the unattended computer memory card contained incomplete data, are to be drawn in favor of Mr. Goldsborough, as the party opposing the respondents' summary judgment motions, and raise a genuine issue of material fact as to whether the subject continuous miner machine was defective.

Thus, where, as here, differing inferences may be drawn from the evidence presented, and a factual inquiry is necessary to a determination of the case at issue, a genuine issue of material fact is present and a jury, not a court, is tasked with the weighing of such evidence. *See* Syl. pt. 2, *Skeen v. C & G Corp.*, 155 W. Va. 547, 185 S.E.2d 493 (1971) ("It is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed."); Syl. pt. 4, *Reilley v. Byard*, 146 W. Va. 292, 119 S.E.2d 650 (1961) ("The question of negligence is for the jury when the evidence relating thereto, though undisputed, is such that reasonable men may draw different conclusions therefrom."). *But see* Syl. pt. 6, *Matthews v. Cumberland & Allegheny Gas Co.*, 138 W. Va. 639, 77 S.E.2d 180 (1953) ("When the material facts are undisputed and reasonable men can draw only one conclusion from them the question of negligence is a question of law for the court."). Accordingly, we reverse the circuit court's orders that found no genuine issues of material fact to exist in this case and remand for further proceedings consistent with this memorandum decision. Because we find summary disposition of this case to be improper, it would be premature to consider the merits of Mr. Goldsborough's remaining assignments of error insofar as a jury, and not this Court, must determine whether he has presented sufficient evidence to support his claims for relief. *See* Syl. pt. 4, *Morningstar v. Black & Decker Mfg. Co.*, 162 W. Va. 857, 253 S.E.2d 666 (1979) ("In this jurisdiction[,] the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made."). *See also* Syl. pt. 3, *Anderson v. Chrysler Corp.*, 184 W. Va. 641, 403 S.E.2d 189 (1991) ("Circumstantial evidence may be sufficient to make a *prima facie* case in a strict liability action, even though the precise nature of the defect cannot be identified, so long as the evidence shows that a malfunction in the product occurred that would not ordinarily happen in the absence of a defect. Moreover, the plaintiff must show there was neither abnormal use of the product nor a reasonable secondary cause for the malfunction.").[6]

---

[6]For the same reason we refuse to consider the merits of Mr. Goldsborough's strict liability claim, we also decline the invitation to decide his breach of warranty claim as such a determination rests with a jury, and not with this Court. *See* Syl. pt. 5, *Jones, Inc. v. W.A. Wiedebusch Plumbing & Heating Co.*, 157 W. Va. 257, 201 S.E.2d 248 (1973) ("A plaintiff, who seeks to recover damages for breach of an [express or an] implied warranty for fitness of purpose, is not required to exclude every possible cause for the defective condition of the goods purchased and may establish the defective nature of the goods by circumstantial evidence."). In light of our finding that the circuit court erred by granting summary judgment to the respondents as to Mr. Goldsborough's claims for relief, we also find that the circuit

7

For the foregoing reasons, we reverse the November 15, 2013, orders of the Circuit Court of Kanawha County and remand this case for further proceedings consistent with this memorandum decision.

Reversed and Remanded.

**ISSUED:**      June 9, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin

**DISSENTING AND WRITING SEPARATELY:**

Justice Menis E. Ketchum
Justice Allen H. Loughry II

---

court erred by denying Mrs. Goldsborough's derivative loss of consortium claim. Accordingly, we reverse the circuit court's ruling in this regard as well.

Justice Ketchum, dissenting, with Justice Loughry joining:

This Court's standards of review concerning summary judgment are well settled. As the majority acknowledges, one of those standards requires the non-moving party to offer some concrete evidence upon which a reasonable fact finder can return a verdict for the non-moving party, or some other, significant probative evidence tending to support the non-moving party's complaint. My assessment of the appendix record in this action reveals that the evidence presented to the circuit court by the Goldsboroughs was merely conjectural and provides no justification to reverse the summary judgments entered in favor of Bucyrus and Structured Mining. Therefore, I dissent.

**I.**
**The Accident, the MSHA Investigation,**
**and the Report of Structured Mining**

On the day of the accident, Kenneth Goldsborough ("Goldsborough") was operating a Series 25M-2 continuous miner designed and manufactured by DBT, Inc., a predecessor of Bucyrus. Goldsborough was controlling the movement and functions of the machine with a wireless TX-944 remote control transmitter manufactured by Structured Mining. Goldsborough was operating the continuous miner, with the wireless transmitter, while standing in a safe area, a few feet to the rear of the machine. The continuous miner was equipped with a Compact Flash ("CF") data storage card, on which information concerning the functioning of the machine was recorded.[1]

---

[1]A fundamental understanding of the continuous miner and the remote control system Goldsborough was operating on the day of the accident is critical to Goldsborough's assertion that the equipment was defective.

A continuous miner is a large, electrically powered machine that moves on metal tracks similar to a bulldozer and is used to sump and remove coal from a coal entry or seam with rotating drums. The drums are equipped with replaceable metal bits or cutting heads. The 25M-2 continuous miner in this action was operated by means of a remote control system which included the wireless TX-944 transmitter. The transmitter communicated with a receiver and computer unit (the "MCU" or master control unit) located on-board the continuous miner. Information from the MCU, relating to the functioning of the continuous miner, while in operation, was recorded on a Compact Flash ("CF") data storage card. The recorded information included voltages, temperatures and faults or errors. If an operator chooses a function that is not permitted, an error is recorded by the remote control system.

Electric current is supplied to the continuous miner from a power center within the

Goldsborough maintains that he finished extracting coal from an entry cut within his assigned section of the mine and began tramming the continuous miner backward to make room for the roof bolting crew. He noticed that a ventilation curtain was caught on the left side of the machine's cutting heads. According to Goldsborough, he shut down the continuous miner by pressing the stop button on his wireless transmitter. Then, walking along the three foot space on the right side of the continuous miner and across its front, he flipped the curtain off the cutting heads. Retracing his steps, he proceeded to walk back toward his operating position behind the machine. Goldsborough contends that, as he neared the machine's rear corner, the continuous miner suddenly and unexpectedly moved sideways, crushing and pinning him between the right side of the machine and the right coal rib.

According to a crew foreman at the scene, Goldsborough's transmitter was found smashed with the stop button "pushed in on the box."[2] Although the transmitter was damaged, it was functional for purposes of subsequent testing.

Shortly after the accident, officials from the federal Mine Safety and Health Administration ("MSHA") arrived at the scene and began an investigation. Three days later, on June 30, 2008, MSHA took possession of the TX-944 transmitter and the CF card for off-site testing. Soon after, MSHA took possession of the continuous miner's receiver and MCU component.

On August 12, forty-six days after the accident, MSHA performance tested the TX-944 transmitter. Although the transmitter was not opened and inspected internally for signs

---

underground mine. The functions of the continuous miner are controlled with the transmitter via eight push buttons, thirteen toggle switches, two tram levers and a large stop button. To start up the continuous miner, the operator must engage both the pump motor enable switch and the pump start switch. In order to begin tramming (moving) the continuous miner, the operator must engage both the tram enable switch and the tram levers. Unless the pump motor is running, the continuous miner is not capable of tramming. The hand-held transmitter is equipped with left and right tram levers, which allow the operator to move the continuous miner forward, backward or diagonally. The continuous miner is trammed forward into the coal entry, or seam, to sump and remove coal.

[2]Jason Nealis, a roof bolter working approximately 50-75 feet away, was the first person to reach Goldsborough after the accident. During his deposition, Nealis indicated that he heard Goldsborough's continuous miner being trammed, that "[a]ll of a sudden, it shut off," that the accident occurred and that Goldsborough instantly called for help. Later in his deposition, however, Nealis stated that he could not remember whether Goldsborough had the continuous miner off before Goldsborough called for help.

10

of moisture or other foreign material, MSHA determined that

> [w]hen tested, the remote control system functioned as expected. Operation of the push buttons, switches and control levers on the operator's remote control unit provided the desired output from the remote control system's computer interface (MCU). All of the safety features of the remote control system were tested successfully, particularly those associated with tram operation, emergency stop, and circuit breaker trip/reset.

MSHA concluded that the continuous miner's remote control system functioned as designed and that there was no evidence that a malfunction contributed to Goldsborough's accident. Instead, MSHA indicated that Goldsborough was injured because, rather than shutting off the continuous miner, he was operating the machine while standing in a "Red Zone" (an area around mobile equipment that presents a "pinch point" hazard).[3] According to MSHA, "[t]he accident occurred because the continuous miner operator was in a known hazardous location between the continuous miner and the mine rib while operating the mining machine." The West Virginia Office of Miners' Health, Safety and Training ("WVOMHST") reached a similar conclusion.

The remote control components and the CF card were returned to the mine operator, Wolf Run Mining Company. Later, the smashed or damaged transmitter was sent to Structured Mining for repair. In a customer report dated September 18, 2008, eighty-three days after the accident, Structured described its findings as follows: "TX was in pinch point - case broken - crack in top lid - evidence of water inside case."

Given the delay between the accident and Structured's receipt of the transmitter, as well as the damage to the transmitter, it cannot be shown from Structured's report that water was present in the case at the time of the accident.

## II.
### The Circuit Court's
### Findings and Conclusions

Goldsborough's action against Bucyrus and Structured Mining is based on a theory of strict product liability. The complaint alleged that the accident occurred because the continuous miner and the remote control system were defectively designed, *i.e.*, the continuous miner unexpectedly powered up and moved diagonally without activation by Goldsborough of the TX-944 transmitter.

---

[3]A Red Zone ceases to exist when the mobile equipment is turned off.

11

Goldsborough asserted that the continuous miner was defectively designed in two respects which alone, or in combination, caused the accident: (1) the TX-944 transmitter short-circuited because it failed to block the infiltration of water, moisture and dust into the transmitter case and (2) the unexpected movement occurred because the TX-944 transmitter was designed to function on the same radio frequency as a transmitter being used with a second underground continuous miner, which was in operation 164 feet away from the scene of Goldsborough's accident. The complaint also alleged negligence against Bucyrus and Structured Mining and alleged a breach of express and implied warranties. The claims of negligence and breach of warranties were based on the same alleged defects of the continuous miner and the remote control system.

The parties conducted extensive discovery in the action, and on April 22, 2013, Bucyrus and Structured Mining filed separate motions for summary judgment. On November 15, 2013, the circuit court entered separate orders granting the motions. The circuit court rejected Goldsborough's claims of strict product liability, negligence and breach of warranty. The circuit court found that the alleged defects could not be shown by direct or circumstantial evidence.

The circuit court noted that Goldsborough's expert witness, Roy S. Nutter, (who never saw the transmitter) could not clearly state that infiltration of water, moisture and dust into the transmitter case most likely caused the accident. Nutter was also unable to clearly state that the accident was most likely caused by the fact that Goldsborough's transmitter was operating on the same frequency as the transmitter pertaining to the other continuous miner in the same area of the mine.

### III.
### Discussion

Pursuant to Rule 56 of the *West Virginia Rules of Civil Procedure*, summary judgment is proper where the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As a result of that straightforward language, this Court's standard of review concerning summary judgment is well settled. Syllabus point 3 of *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of N. Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963), holds: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Accord* syl. pt. 1, *Coleman Estate v. R.M. Logging, Inc.*, 222 W. Va. 357, 664 S.E.2d 698 (2008).

As this Court confirmed in *All Med, LLC v. Randolph Engineering Co., Inc.*, 228 W. Va. 634, 638, 723 S.E.2d 864, 868 (2012), the evidence purporting to show a factual controversy cannot be "conjectural or problematic" Moreover, the non-moving party cannot

create a genuine issue of material fact "through mere speculation or building of one inference upon another."

## A. The Law Relating to Strict Product Liability

Goldsborough maintains that he turned off the continuous miner and that, while walking toward the rear of the machine after freeing the ventilation curtain, the continuous miner suddenly and unexpectedly activated and moved diagonally, crushing him against the coal rib. He asserts that (1) the transmitter short-circuited because it failed to prevent water, moisture and dust from getting into the transmitter case and/or (2) the unexpected movement occurred because Goldsborough's transmitter functioned on the same frequency as a transmitter being used with a second continuous miner. Whether Goldsborough has converted those assertions to triable questions for the jury requires a review of this Court's relevant case law.

Principles relating to manufacturer liability where a product is defective were set forth by this Court in *Morningstar v. Black and Decker Mfg., Co.*, 162 W. Va. 857, 253 S.E.2d 666 (1979). Relevant to this action are syllabus points 3 and 6 of *Morningstar* wherein this Court stated:

> 3. The cause of action covered by the term "strict liability in tort" is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability.

> 6. The question of what is an intended use of a product carries with it the concept of all those uses a reasonably prudent person might make of the product, having in mind its characteristics, warnings and labels.

Subsequently, in *Anderson v. Chrysler Corp.*, 184 W. Va. 641, 403 S.E.2d 189 (1991), the plaintiffs alleged a strict product liability claim against an automobile manufacturer where the plaintiffs' newly purchased car was destroyed by fire. The plaintiffs asserted that the fire was caused by a defect in the car's electrical system. The circuit court, however, directed a verdict in favor of the manufacturer because the plaintiffs were unable to present direct evidence of the specific defect that caused the fire.

This Court, in *Anderson*, reversed, holding that, in a strict product liability action, a plaintiff can establish a *prima facie* case with circumstantial evidence. Consequently, this Court recognized the "malfunction" theory of product liability and quoted, with approval, the following language from the Supreme Court of Pennsylvania in *Rogers v. Johnson &*

13

*Johnson Products, Inc.*, 523 Pa. 176, 565 A.2d 751 (1989):

> In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the "malfunction" theory of product liability. This theory encompasses nothing more than circumstantial evidence of product malfunction . . . . It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction[.]

184 W. Va. at 645, 403 S.E.2d at 193. Thus, in syllabus point 3 of *Anderson* we held:

> Circumstantial evidence may be sufficient to make a *prima facie* case in a strict liability action, even though the precise nature of the defect cannot be identified, so long as the evidence shows that a malfunction in the product occurred that would not ordinarily happen in the absence of a defect. Moreover, the plaintiff must show there was neither abnormal use of the product nor a reasonable secondary cause for the malfunction.

*Accord* syl. pt. 4, *Bennett v. ASCO Services, Inc.*, 218 W. Va. 41, 621 S.E.2d 710 (2005). *See Nichols v. Steelcase, Inc.*, 2005 WL 1862422 (S.D. W. Va. 2005) (discussing *Morningstar* and *Anderson*).

This Court noted in *Anderson* that there was no evidence of abnormal use or of any reasonable secondary cause of the malfunction.

*Morningstar* and *Anderson* were addressed in *Bennett*, *supra*. In *Bennett*, a home was destroyed by fire, allegedly caused when wiring in an automobile in the adjoining garage ignited, and further caused when the home fire alarm system allowed the fire to spread undetected. After the fire, the automobile and the alarm system were unavailable for inspection. The homeowners, in *Bennett*, filed a strict product liability action against the manufacturers. Granting summary judgments in favor of the manufacturers, the circuit court found that the homeowners failed to identify the product defects in relation to the cause of the fire. The circuit court further found that the homeowners' circumstantial evidence was insufficient because they failed to show that the fire would not have ordinarily happened in the absence of a defect, and also that the homeowners had not adequately eliminated reasonable secondary causes of the fire.

However, this Court, in *Bennett*, found the evidence sufficient to create a question of fact as to whether inherent defects in the automobile and alarm system caused those products

to malfunction, resulting in the fire which destroyed the home. The homeowners' evidence, for example, eliminated other sources than the automobile as the point of origin of the fire. Moreover, the homeowners' evidence established that the fire alarm system should have detected the fire immediately. Setting aside the summary judgments for the manufacturers, the circuit court stated:

> Under *Anderson*, while a defect in a product cannot be presumed solely from the fact that an accident occurred, proof that a product malfunctioned - that is, failed to function as it was intended and typically would in normal usage - is circumstantial proof of its defective condition. *Anderson* does not require a plaintiff, to succeed at the summary judgment stage, to conclusively eliminate all possible contributing causes other than a defect for an accident. Instead, a plaintiff is only required to submit evidence that has the capacity to sway the outcome of the litigation, and from which a jury could fairly conclude that the most likely explanation of the accident involves the causal contribution of a product defect.

218 W. Va. at 48, 621 S.E.2d at 717. Under *Bennett*, a finding is required, as an element of a strict product liability action, that it is "*more probable than not that the product was defective*." 218 W. Va. at 49, 50, 621 S.E.2d at 718, 719. (Emphasis added)

## B. Goldsborough's Evidence
## 1. The Claim that the Transmitter Short Circuited

Goldsborough could not present direct evidence of a product defect to the circuit court because the TX-944 wireless transmitter was unavailable for inspection during this litigation. Goldsborough's liability expert never saw or tested the transmitter. Consequently, Goldsborough relied on circumstantial evidence to assert questions of fact under the "malfunction" theory recognized in *Anderson*.[4] His expert, Roy S. Nutter, who has a speciality in computer forensics and electrical engineering, stated that it was probable that the accident was caused by a short circuit, resulting from a defective transmitter case which failed to block the infiltration of water, moisture and dust. Goldsborough cites numerous repair reports pertaining to the TX-944-style transmitter, including reported instances of foreign substance intrusion.

Goldsborough's evidence, however, does not account for the damage to the transmitter during the course of the accident and the fact that water could have entered the transmitter

---

[4]Although raised by Goldsborough before the circuit court, this appeal does not involve the issue of spoliation of evidence.

case at a later time. Structured Mining's September 18, 2008, customer report, finding evidence of water in the transmitter case, is of no moment because eighty-three days elapsed between the June 27, 2008, accident and the report, and because the transmitter case was smashed and damaged during the accident. Goldsborough's expert, Roy S. Nutter, could not eliminate any reasonable secondary causes of the accident in order to establish a *prima facie* case with circumstantial evidence. Therefore, the evidence Goldsborough presented to the circuit court was speculative.

Concluding that the evidence was insufficient to withstand summary judgment, the circuit court specifically noted that Nutter could not clearly state that infiltration of water, moisture and dust into the transmitter case most likely caused the accident. The circuit court's assessment of Nutter's testimony was correct. Although Nutter went so far as to say that infiltration was the "probable" cause of the accident, his conclusion was a suggestion only and too tenuous a premise for jury consideration.

Particularly damaging to Goldsborough's claim of a short circuit in the transmitter case is the way the transmitter must be operated in order to cause the continuous miner to move. Nutter acknowledged, during his deposition, that water in the transmitter case would have had to have caused a short circuit to activate the pump motor, and, after that, the water would have had to have caused an additional short circuit to activate the tram motors, thereby moving the continuous miner. Nutter testified:

Q. And is it probable that it occurred in that sequence?

A. All we could say is it could. Is it probable it would occur in any sequence? Is it probable that it turned on something else and off? It could. Did it happen here? Show me the insides of this machine at that point in time and we'd know a lot more. *We just don't know*.[5] (Emphasis added)

Bucyrus and Structured Mining insist that there was no evidence "to establish that this alleged water or dust ingress somehow caused an allegedly powered-down continuous miner to activate its pump motor and tram motors in the proper sequence in order to cause the continuous miner to move." Roof bolters Jason Nealis and Steve Braham testified during

---

[5]Nutter noted that "the pump would have to be running, yes, before left and right tram motors can be energized." *See* n. 1, *supra* (describing the operation of the 25M-2 continuous miner with the TX-944 wireless transmitter).

their depositions that they have never seen a continuous miner turn itself on.[6] Consequently, Bucyrus and Structured Mining argue, with justification, that *Anderson* was not intended to support a strict product liability action on the basis of expert testimony that is conclusory in nature.

In *Morningstar*, this Court set forth the "risk/utility analysis" adopted by the Supreme Court of New Jersey[7] consisting of several factors which should be considered to determine whether a product is defective.[8]  This Court, in *Morningstar*, stated:

---

[6]The appendix record includes testimony that, due to inertia build-up during the operation of a continuous miner, the machine will commonly drift several feet when the tram levers are "centered" or when the machine is powered down, which can be mitigated by the installation of braking systems.  Such an occurrence is unrelated to the alleged spontaneous activation, or powering up, of a continuous miner due to a malfunctioning transmitter.

[7]*See Cepeda v. Cumberland Eng'g Co., Inc.*, 76 N.J. 152, 386 A.2d 816 (1978), *overruled on other grounds by Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 406 A.2d 140 (1979).

[8]The factors to be considered in the "risk/utility analysis" are as follows:

(1) The usefulness and desirability of the product - its utility to the user and to the public as a whole.
(2) The safety aspects of the product - the likelihood that it will cause injury, and the probable seriousness of the injury.
(3) The availability of a substitute product which would meet the same need and not be as unsafe.
(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
(5) The user's ability to avoid danger by the exercise of care in the use of the product.
(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

162 W. Va. at 886 n. 20, 253 S.E.2d at 681 n. 20.

We believe that a risk/utility analysis does have a place in a tort product liability case by setting the general contours of relevant expert testimony concerning the defectiveness of the product. In a product liability case, the expert witness is ordinarily the critical witness. He serves to set the applicable manufacturing, design, labeling and warning standards based on his experience and expertise in a given product field.

162 W. Va. at 887, 253 S.E.2d at 682.

In the present action, the circuit court concluded with regard to the availability of a substitute product:

Dr. Nutter was not aware of any specific relevant details of the TX-944 system's design, nor was he able to present any testimony as to the details of a reasonably safe alternate design. Thus, Dr. Nutter did not present any testimony relevant to understanding what a "reasonably prudent manufacturer would accomplish in regard to the safety of the product[.]" Absent some relevant understanding of what a reasonably safe design would include, and how the details of such a design differ from the corresponding design elements of the TX-944 system, there is simply no evidentiary basis for a jury to conclude that the TX-944 was not reasonably safe.

### 2. The Claim that Another Transmitter
### Caused Goldsborough's Continuous Miner to Move

The circuit court also found no merit in Goldsborough's contention that the continuous miner suddenly moved because the TX-944 transmitter was designed to function on the same frequency as a transmitter being used with a second continuous miner. The second continuous miner, a Series 25M-2 with a TX-944 wireless transmitter, was in operation 164 feet away from the scene of the accident. According to Nutter, the use of a single frequency for multiple transmitters was unsafe because, as so designed, a transmitter could activate the wrong continuous miner.

Bucyrus and Structured Mining, however, presented evidence that the second continuous miner and its transmitter were not in operation at the time of Goldsborough's accident. In any event, during the subsequent investigation, both continuous miners were activated, and it was determined, as noted by the circuit court, that the transmitter for the second continuous miner controlled only the second continuous miner and not the machine involved in the accident. In that regard, Bucyrus and Structured Mining emphasized their use of a safety feature known as "teach-learn," which pairs a specific transmitter with a specific continuous miner. The teach-learn safeguard ensures that only one transmitter will

be able to control the movement and functions of a continuous miner.[9] Moreover, Bucyrus and Structured Mining maintained that the alternative, *i.e.*, multiple frequencies, would be subject, over time, to "frequency drift" which can cause equipment to falsely activate.

Most significant is the testimony of Nutter, Goldsborough's expert, who admitted that he was not in a position to evaluate whether the single frequency design was defective. During his deposition, Nutter stated:

Q. Is it your opinion that a system utilizing teach-learn and runs on a single frequency is a defective design?

A. Runs on a single frequency.

Q. Utilizing teach-learn. Is that a defective -

A. Well –

Q. – design, in your opinion?

A. – again, I don't know enough about teach-learn to answer that question.

\* \* \*

Q. . . . Do you know if any other manufacturers of remote controlled continuous miners utilize multiple frequencies as opposed to single frequencies?

A. I do not know.

Q. Have you done anything to investigate that?

―――――――――――――――――――

[9]The circuit court observed:

The teach-learn process is carried out by physically connecting a specific transmitter to a specific continuous miner when using a transmitter for the first time with a continuous miner, which ensures that the transmitter will be able to control the movement and functions of only that specific continuous miner.

19

A. I have not.

In entering the summary judgments, the circuit court noted Nutter's unfamiliarity with the teach-learn technology.

Syllabus point 2 of *Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171 (1995), states, in part:

> A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Once the movant makes this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue. An expert's deposition or affidavit *that is conclusory only* is not sufficient to meet the burden on the party opposing the motion, although an affidavit or deposition containing an adequately supported opinion may suffice to raise a genuine issue of fact.

(Emphasis added) *See State v. LaRock*, 196 W. Va. 294, 307 n. 16, 470 S.E.2d 613, 626 n. 16 (1996) ("An expert opinion that is merely conclusory, even if couched in the language of the relevant legal standard, will be of little assistance to a trier of fact.").

Viewing the facts and inferences in the light most favorable to Goldsborough, I am of the opinion that Goldsborough failed to carry his burden in opposing the motions for summary judgment. I find no sufficient ground to overturn the result set forth in the orders of the circuit court.[10]

For the reasons stated, I respectfully dissent.

---

[10]Goldsborough also asserts error with regard to the missing Compact Flash ("CF") data storage card, which recorded information relating to the functioning of the continuous miner Goldsborough was operating, including voltages, temperatures and faults or errors.

During MSHA's investigation, it was discovered that some of the data from the CF card (or from a downloaded version of the card) was missing for the time period of the accident. The missing data concerned voltage information as well as entries in the errors log. The MSHA report noted that the missing data was "unexplained." Nevertheless, MSHA found the remaining data to be sufficient. That is because MSHA found no evidence of a malfunction in the continuous miner's remote control system, either through performance testing "or from information stored on the data storage card." Therefore, Goldsborough's assertion is without merit.

20